IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2017 Term

No. 16-0008

FILED
June 14, 2017
released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

JANE DOE-1, Individually and as Parent, Guardian, and Next Friend of J.T.,
a Minor, and W.T., a Minor; JOHN DOE-1, Individually; JANE DOE-2, Individually
and as Parent, Guardian, and Next Friend of Z.W., a Minor, and A.W., a Minor;
JANE DOE-3, Individually and as Parent, Guardian, and Next Friend of C.H., a Minor;
JOHN DOE-3, Individually; JANE DOE-4, Individually and as Parent, Guardian, and
Next Friend of A.B., a Minor; JANE DOE-5, Individually and as Parent, Guardian,
and Next Friend of T.S., a Minor, and M.S., a Minor; JOHN DOE-5, Individually;
JANE DOE-6, Individually and as Parent, Guardian, and Next Friend
of P.C., a Minor; and JOHN DOE-6, Individually,
Plaintiffs Below, Petitioners

v.

CORPORATION OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY SAINTS, CORPORATION OF
THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, STEVEN GROW, DON FISHEL,
CHRISTOPHER MICHAEL JENSEN, CHRISTOPHER JENSEN,
SANDRALEE JENSEN, and UNNAMED DEFENDANT-1,
Defendants Below, Respondents

Appeal from the Circuit Court of Berkeley County
Honorable John C. Yoder, Judge
Civil Action No. 13-C-656

REVERSED AND REMANDED

Submitted: May 16, 2017
Filed: June 14, 2017

Robert P. Fitzsimmons, Esq.
Fitzsimmons Law Firm PLLC
Wheeling, West Virginia

Carl S. Kravitz, Esq.
Zuckerman Spaeder LLP
Washington, DC
Counsel for the Petitioners

Thomas V. Flaherty, Esq.
Flaherty Sensabaugh Bonasso PLLC
Charleston, West Virginia
Counsel for the Respondent UD-1

Mark A. Atkinson, Esq.
John J. Polak, Esq.
Atkinson & Polak, PLLC
Charleston, West Virginia
Counsel for the Respondents Christopher
    Jensen and Sandralee Jensen


Thomas J. Hurney, Jr., Esq.
Jackson Kelly PLLC
Charleston, West Virginia

William J. Powell, Esq.
Jackson Kelly PLLC
Martinsburg, West Virginia
Counsel for the Respondents Corporation
of the President of the Church of Jesus
Christ of Latter-Day Saints, Corporation
of the Presiding Bishop of the Church of
Jesus Christ of Latter-Day Saints, Steven
Grow, and Donald Fishel

CHIEF JUSTICE LOUGHRY delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1. "In reviewing a circuit court's certification under Rule 54(b) of the West Virginia Rules of Civil Procedure, this Court applies a two-prong test. First, we scrutinize *de novo* the circuit court's evaluation of the interrelationship of the claims, in order to decide whether the circuit court completely disposed of one or more claims, which is a prerequisite for an appeal under this rule. As to the second prong of the inquiry under the rule–whether there is any just reason for delay–this Court accords the circuit court's determination considerably more deference than its first-prong determination. The circuit court's assessment that there is 'no just reason for delay' will not be disturbed unless the circuit court's conclusion was clearly unreasonable, because the task of balancing the contending factors is peculiarly one for the trial judge, who can explore all the facets of a case." Syl. Pt. 1, *Province v. Province*, 196 W.Va. 473, 473 S.E.2d 894 (1996).

2. "'"Where an appeal is properly obtained from an appealable decree either final or interlocutory, such appeal will bring with it for review all preceding non-appealable decrees or orders, from which have arisen any of the errors complained of in the decree appealed from, no matter how long they may have been rendered before the appeal was taken." Point 2, syllabus, *Lloyd v. Kyle*, 26 W.Va. 534 [1885].' Syllabus point 5, *State ex rel. Davis v. Iman Mining Co.*, 144 W.Va. 46, 106 S.E.2d 97 (1958)." Syl. Pt. 6, *Riffe v. Armstrong*, 197 W.Va. 626, 477 S.E.2d 535 (1996).

i

3.  "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means.  The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff."  Syl. Pt. 8, *Dunn v. Rockwell*, 225 W.Va. 43, 689 S.E.2d 255 (2009).

4.  " A civil conspiracy is . . . a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)."  Syl. Pt. 9, in part, *Dunn v. Rockwell*, 225 W.Va. 43, 689 S.E.2d 255 (2009).

LOUGHRY, Chief Justice:

The petitioners (plaintiffs below) are nine minors and their parents, individually and as parents, guardians, and next friends,[1] in this action alleging various negligence claims, fraud, intentional infliction of emotional distress, assault, battery, and civil conspiracy related to, arising from, and resulting in defendant Michael Jensen's known and alleged sexual abuse of the minor plaintiffs.[2] Following extensive discovery, the circuit court entered an order on December 4, 2015, through which it granted summary judgment in favor of the respondent (defendant below), Unidentified Defendant-1 ("UD-1"), against whom conspiracy was the only claim asserted. On December 30, 2015, the circuit court entered an order granting several of the defendants' motions in limine which eliminated a large portion of the

---

[1]Currently, the plaintiffs are Jane Doe-1, individually and as parent, guardian, and next friend of J.T., a minor, and W.T., a minor; John Doe-1, individually; Jane Doe-2, individually and as parent, guardian, and next friend of Z.W., a minor, and A.W., a minor; Jane Doe-3, individually and as parent, guardian, and next friend of C.H., a minor; John Doe-3, individually; Jane Doe-4, individually and as parent, guardian, and next friend of A.B., a minor; Jane Doe-5, individually and as parent, guardian, and next friend of T.S., a minor, and M.S., a minor; John Doe-5, individually; Jane Doe-6, individually and as parent, guardian, and next friend of P.C., a minor; and John Doe-6, individually. During the course of this litigation, certain of the original minor plaintiffs were dismissed without prejudice; John Doe-2 was dismissed with prejudice by stipulation.

[2]Michael Jensen is currently incarcerated on convictions for his sexual abuse of two of the minor plaintiffs, J.T. and W.T., as discussed more fully *infra*, section I. He did not participate in this appeal.

1

plaintiffs' circumstantial evidence in support of their conspiracy claim.[3] The following day, December 31, 2015, the circuit court entered an order granting summary judgment on the plaintiffs' conspiracy claim in favor of the respondents (defendants below), Corporation of the President of The Church of Jesus Christ of Latter-day Saints, Corporation of the Presiding Bishop of The Church of Jesus Christ of Latter-day Saints, Steven Grow, and Don Fishel (collectively the "Church defendants"), and in favor of the respondents (defendants below), Christopher Jensen[4] and Sandralee Jensen.[5]

On January 11, 2016, the circuit court entered an order certifying its interlocutory summary judgment rulings as final judgments pursuant to West Virginia Rule of Civil Procedure Rule 54(b).[6] In addition to seeking a reversal of the summary judgment

---

[3]The order granting summary judgment in favor of UD-1 was entered prior to these in limine rulings.

[4]Consistent with the parties' briefs, Christopher Jensen will be referred to as "Chris" Jensen.

[5]At times, the Church defendants and the Jensen parents are jointly referred to as the "defendants."

[6]Rule 54(b) provides, in part, as follows:

> *Judgment Upon Multiple Claims or Involving Multiple Parties.* — When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express

(continued...)

2

orders, the plaintiffs ask this Court to reverse those in limine rulings. They assert these rulings facilitated the circuit court's issuance of summary judgment rulings without first evaluating the evidence offered in support of their conspiracy claims under the strictures applicable to summary judgment.

Upon our careful review of the parties' briefs, the arguments of counsel, the appendix record submitted, and the applicable law, we reverse the summary judgments and in limine rulings and remand this action for further proceedings consistent with this opinion.

## I. Facts and Procedural Background[7]

In late 2004, Chris and Sandralee Jensen (collectively the "Jensen parents") and their children were residing in or near Provo, Utah. Their son Michael Jensen, who was then thirteen years old, was arrested at his middle school and charged with two felony counts of sexual abuse of a child. The incidents occurred in November and December of 2004, and his female victims were twelve and thirteen years old, respectively. On both occasions, Michael waited for his victim to exit a classroom before pinning her against a wall and grabbing her buttocks and breasts without her consent. One of the victims indicated in her statement to

[6](...continued)
determination that there is no just reason for delay and upon an express direction for the entry of judgment.

[7]With a couple of exceptions, the majority of the testimony referenced herein was taken during depositions.

3

the police that during Michael's attack upon her person, he told her that they needed to have sex; that she was "really scared"; and that she had kneed Michael in the groin to get away. The defendants minimize the severity of the incidents describing them instead as brief groping of two female classmates over their clothes while at school.

The plaintiffs allege that a conspiracy began in Provo when The Church of Jesus Christ of Latter-day Saints ("Church") influenced Michael's criminal proceeding, which resulted in the two felonies charges being reduced to misdemeanor sexual offenses. Among other assertions, the plaintiffs state that Michael's paternal grandfather, Blaine P. Jensen, who has held very high positions within the Church,[8] attended a meeting between Michael and Michael's attorneys, and was present for Michael's dispositional hearing in January 2015. Dale Swensen, Michael's Church bishop[9] in Provo, also attended the dispositional hearing. During this hearing, the juvenile petition was read and reports were

---

[8]Blaine Jensen's positions have included Director of International Affairs for the Church and worldwide Director of Physical Facilities for the Church. There is a representation in the record that Mr. Jensen currently serves as the Stake Patriarch in Provo, a life-long position. During his deposition, Mr. Jensen acknowledged both professional and personal relationships with two former Church Presidents and the current President of the Church, which the plaintiffs rely upon to support their theory of the Church's influence in Michael's case.

[9]The Church is divided into "wards," which encompass defined geographic territories. Church members belong to the ward associated with his or her residence. Several wards in a geographical area form a "stake." The clergyman of each ward is a bishop, and the clergyman of each stake is a president. These positions are held by volunteers for a number of years.

4

submitted, including a Sexual Behavior Risk Assessment ("SBRA"),[10] which indicated that

Michael's offenses are based primarily on opportunity" and that he "will offend if given the

opportunity." The juvenile court then accepted Michael's admission to reduced charges of

two misdemeanor counts of lewdness involving a child; placed him on probation; ordered

[10]The SBRA reflects that the first appointment for the assessment was not completed. Once the psychologist explained the testing process to Michael and his father, Chris, "Mr. [Chris] Jensen appeared somewhat angry" and was "visibly upset" when told that he would "not be allowed to be present" during the evaluation because it "would compromise the integrity and validity of the assessment." The SBRA further reflects that Mr. Jensen became "more assertive and tenacious" and eventually stated that he and Michael "would pass" on the evaluation. A second appointment was scheduled and Michael was brought to that appointment by his mother, Sandralee. According to the SBRA, Michael reported to the evaluating psychologist that his attorney had told him not to discuss what had happened, but he proceeded to do so anyway. He also told the evaluating psychologist that he stopped babysitting his younger siblings, including two sisters, ages seven and five, after the charges were filed against him. The psychologist stated in the SBRA that Michael "denied knowing the meaning of consent and denied knowing how age makes a difference in giving consent for sexual activity." When asked about the impact his actions had on his victim, Michael replied: "They could probably damage her for life, she might be scared of boys now[.]"

The SBRA contains the psychologist's observation that Michael "displays significant thinking errors regarding sexuality and children" and that his "attitude about the alleged abuse is of significant concern given that he blames the victim and much anger appeared to exist regarding his reported resistance by the victim towards his alleged demonstrations of affection." The psychologist recommended that the court *order* sex offender specific treatment due to Michael's "low motivation for treatment" and his father's "defensiveness." As the psychologist cautioned: "the issues that exist . . . could again arise at a later date when Michael would be at risk for more severe consequences . . . . It would be best to be less defensive in Michael's interest and confront the issues that exist in a productive manner." The psychologist concluded that Michael was a "low to moderate" risk to offend with peer-aged females, but that he also needed "to be supervised with any female, including his sisters . . . until his therapist considers that his risk is reduced." The plaintiffs state that there is no evidence that any therapist ever concluded that Michael's risk was reduced and that their expert is expected to testify that the SBRA was "a flashing red warning light" of likely future abuse by Michael Jensen if he did not receive treatment.

his parents to comply with the terms of probation; and ordered him to complete fifty hours of community service and a Sexual Appropriateness Class with the family component with proof of completion to be provided to the court. The defendants allege the plaintiffs have no evidence the Church influenced Michael's proceeding in any manner and that affidavits and declarations from the prosecutors involved in Michael's juvenile proceeding refute the existence of any such influence. Although the defendants allege Blaine Jensen's involvement was simply that of a grandfather assisting his grandson, the plaintiffs point to evidence that Michael told his friend, J.C., he had been in legal trouble in Utah and that his grandfather "was in a leadership position for the church . . . [and] helped take care of whatever needed to be taken care of."[11]

The plaintiffs further allege that although the Church knew that Michael had pled guilty to two sex offenses in Utah, it did nothing to warn or protect, despite the existence of an abuse "prevention and response" procedure, referred to as an "annotation system." The defendants allege that their evidence demonstrates that the Church "rarely" annotates its records for children, and "even less so where the misconduct does not indicate a danger to much younger children."[12]

---

[11]In its in limine ruling that excluded any allegations of the Church's influence over these Utah court proceedings, the circuit court found "Michael's cryptic boast to a friend" to have "limited probative value."

[12]The entirety of the plaintiffs' evidence concerning Michael's juvenile criminal
(continued...)

6

During the summer of 2005, the Jensen family moved to Martinsburg, West Virginia. Soon thereafter, Sandralee Jensen was asked to serve as the Church's Relief Society President for her new ward,[13] which she accepted. In that role, Mrs. Jensen reported directly to her ward bishop, who was at that time Matthew Whitcomb. She also oversaw the Sunday class for the women and was responsible for "compassionate service" for all ward members. Shortly thereafter, Chris Jensen was placed on the Stake High Council,[14] which is an advisory body to the Stake President, who at all relevant times was defendant Stephen Grow.

In their effort to further demonstrate the defendants' knowledge and awareness of Michael's history as an abuser, the plaintiffs allege there was a Stake High Council meeting in 2006 or 2007,[15] during which leaders of the Martinsburg Stake discussed Michael

---

[12](...continued)
proceeding in Utah, including the SBRA, was excluded in the circuit court's in limine ruling.

[13]A document in the appendix record describes this position as "[t]he second most important job in the ward."

[14]The Church defendants state that the Stake High Council is an advisory group that delivers the stake president's messages to wards and assists in certain ecclesiastical disciplinary hearings.

[15]All evidence concerning this 2006 or 2007 Stake High Council meeting was excluded by the circuit court in its in limine ruling.

Jensen's abuse of a younger sister[16] and possibly another girl, and Chris Jensen's possible abuse of his son Michael. They further allege that at this same time, Stake President Grow asked UD-1 to "keep an eye" on Chris Jensen, who was UD-1's close friend, and to report back to him. UD-1 indicated during a recorded interview that through his position on Church councils, he was aware that Church leaders had been working hard with Michael Jensen to get him the help that he needed in the 2007-2008 time frame.[17] The defendants deny that this

---

[16]The plaintiffs allege that shortly after the Jensens moved to West Virginia, Michael's youngest sister, R.J., who was six or seven years old at the time, removed her clothing at a Church function and displayed her genitals to same-aged boys. The plaintiffs rely upon this incident to show that by 2006, the defendants knew that Michael had committed two sexual offenses in Utah and that his youngest sister was exhibiting signs of sexual abuse, as opined by the plaintiffs' expert. Conversely, the defendants state that there is no evidence that R.J. was abused by anyone; that the plaintiffs' expert could not definitively say that R.J. had been abused; that the plaintiffs' "signs" are explained by R.J.'s "developmental disability" and limited I.Q.; and that the plaintiffs have made this "scurrilous and offensive speculation" concerning R.J. to try to correct a problem in their evidence. This purported problem related to the plaintiffs' allegation that Michael Jensen's sexual abuse of a younger sibling was discussed at the alleged Stake High Council meeting in 2006 or 2007, when the only certain abuse of a younger sibling by Michael involved his sister K.J. in 2010. The plaintiffs' evidence concerning this incident involving R.J. was excluded through the circuit court's in limine ruling.

[17]UD-1 was interviewed by plaintiffs' counsel in January of 2014. At that time, he referenced discussions years earlier at the Church's Stake High Council level concerning the Jensens; the charges that had been brought against Michael when he was twelve or thirteen years old in Utah; and how he knew the prosecutor "really worked hard with the Jensens to try to get Mich[a]el the help that he needed, and I know that the ecclesiastical leaders had worked hard with the Jensens and with Michael to get him the help that he needed." UD-1 remarked on the manner in which Chris Jensen reacted after being "given sweetheart deals to get his son the help that his son needs, for him to violently react the way he did, to storm out of the room and that type of thing . . .." *See supra* note 10. When UD-1 was deposed several months later, he testified quite differently concerning these matters, which he attributes to plaintiffs' counsel's "imprecise, vague, and leading questions" when he was
(continued...)

8

2006-2007 Stake High Council meeting ever took place or that Stake President Grow ever made such a monitoring arrangement with UD-1.

The plaintiffs allege that by April 2007, through her role as Relief Society President, Sandralee Jensen was arranging for Michael to babysit the children of ward families. They further allege that because there had been no disclosures concerning Michael's prior sex offenses in Utah by the Jensens or the Church defendants, the plaintiff Doe-6 parents allowed their four-year-old daughter P.C. to be babysat by Michael, who sexually and physically abused her by repeatedly laying down in bed with her and making her touch his penis. The plaintiffs further allege that when the Doe-6 parents returned home, P.C. was extremely upset; had a handprint-shaped bruise on her bottom; and was terrified of Michael. When Jane Doe-6 confronted the Jensens parents, who were both Church officers at the time, they explained that P.C. was upset because Michael had not fed the Doe-6 children properly. Sandralee Jensen assumed that Michael had spanked P.C., and Chris Jensen believed that Michael needed more "tutelage from his mother" to become a better babysitter.[18]

---

[17](...continued)
interviewed. Whereas UD-1 referenced the earlier Stake High Council meetings during which abuse by Michael was discussed and remarked as to Chris Jensen's "violent[] react[ion] . . . storm[ing] of the room" when his son Michael was "given sweetheart deals" to get the help he needed, UD-1 backed away from these statements when deposed.

[18]Although the physical abuse was evident, P.C. did not report the sexual abuse until
(continued...)

9

Moving forward to June 2007, the plaintiffs allege that Michael Jensen assaulted J.M., a fourteen-year-old girl. J.M. testified that Michael invited her to go to the movies, telling her there was a "huge group of people" from the church going. According to J.M., after her mother dropped her off at the movie theater, Michael purchased her ticket and, as they walked through the door of the theater, he grabbed her, pulled her close, and started touching her breasts. She testified that he then pulled her outside the theater, pushed her up against a wall, and continued touching, kissing, and "doing all this other stuff" as she tried to press him back. Explaining further, she testified that Michael's older brother, Blaine, came out of the theater, yelled Michael's name, "dr[agged] him [Michael] inside the theater," and thereafter kept Michael away from her. She testified that she was upset; that Michael had made her feel as if she "owed him something just because he paid for [her] ticket"; and that she did not report the incident to the police because she was humiliated. She further recounted subsequent contact with Mrs. Jensen, who approached her and asked whether she was okay and "do we have a problem?" The plaintiffs allege that Mrs. Jensen "linked in her mind" the incident with J.M. to Michael's Provo sex offenses, which prompted her to confer with Bishop Whitcomb about the matters. Mrs. Jensen testified that the only "link" in her

[18](...continued)
2012. The appendix record contains a police report that discusses an interview of P.C. at the Child Advocacy Center regarding Michael's alleged abuse of her. As reflected in this report, P.C. alleged that when Michael put her down for a nap, he would lock the door to her bedroom because her brothers were also in the house; that Michael was afraid that her brothers would discover that he was making her touch his penis; that this happened several times in her bed; and that she described the feeling as being "hairy down there."

10

mind was her concern, as a religious woman, with Michael's "pre-marital displays of sexuality[,]" and that her conversation with Bishop Whitcomb was along those lines with only a passing reference to Michael's offenses in Utah.[19]

During the fall of 2007, the plaintiffs allege that Church leaders discussed Jane and John Doe-1's marital difficulties and that Sandralee Jensen, as Relief Society President, offered Michael as a babysitter if the Doe-1 parents needed some time alone. Mrs. Jensen testified that she did not disclose Michael's sex offenses in Utah or the injury he had inflicted on P.C. to Jane Doe-1. The plaintiffs allege Mrs. Jensen also failed to mention that Michael was no longer allowed to babysit his siblings, Michael's assault of J.M., or her conclusion that he should not babysit unsupervised. Jane Doe-1 accepted Mrs. Jensen's offer of child care, and Michael babysat J.T., then aged three, and W.T., then aged four. These children would later disclose to their parents that the evening Michael babysat them, he blindfolded them, put ketchup on his penis, and forced them to perform oral sex on him. Criminal charges for these offenses were brought against Michael in 2012. He was tried, convicted, and sentenced to thirty-five to seventy-five years in the penitentiary, and he has been designated a "violent sexual predator."[20]

---

[19]Through its in limine rulings, the circuit court excluded all evidence concerning the J.M. incident.

[20]*See* W.Va. Code § 15-12-2a (2014).

11

In early 2008, UD-1's two-year-old son, C.P., was cared for in the Jensen home and came home with a swollen penis and abrasions on the inner part of his upper thighs. Neither UD-1 nor his wife, S.P., who was at that time a neonatal intensive care nurse, sought medical treatment for C.P., which the plaintiffs allege was because they knew it would result in mandatory reporting to state authorities.[21] UD-1 and his wife knew C.P.'s injuries could not have been self-inflicted because of his physical disabilities. When interviewed by the plaintiffs' counsel, UD-1 stated that Sandralee suggested to his wife that C.P.'s injuries might be diaper rash, which his wife, who was a nurse, knew it was not.[22] UD-1 also stated during this interview, as did S.P. during her deposition, that C.P., who had been potty-trained, thereafter began wetting the bed again.

---

[21]The plaintiffs state S.P. responded affirmatively during her deposition when asked whether she and UD-1 did not seek medical treatment for C.P. because they knew any health care provider would have to report to state authorities if a child presented with these injuries. S.P. submitted an errata sheet and the court reporter signed a declaration, both indicating S.P. had given a negative response to this question. Our review of this portion of the videotape of S.P.'s deposition confirms her negative response. Our review further revealed S.P.'s testimony that had her son come to the hospital with those abrasions and a swollen penis, she, as a nurse, would have been required to take such physical evidence at "face value" and further would have reported it to authorities.

[22]S.P. testified she could not recall any discussion about diaper rash. She further testified she did not suspect Michael of having been involved in any fashion and thought, at the time, her son and a younger Jensen child had engaged in exploration that resulted in C.P.'s injuries. She also testified that from that point forward, if they used the Jensens as babysitters, it was one of two Jensen children, neither of whom was Michael.

The plaintiffs allege that sometime between February through April of 2008, Jane Doe-2 approached Sandralee Jensen, who was still serving as Relief Society President, about her need for after-school child care for her sons, four-year-old Z.W. and six-year-old A.W. According to Mrs. Jensen's testimony, she proposed Michael to babysit the children in the Jensen home, indicating she would be there, as well. She did not disclose any information to Jane Doe-2 about Michael's prior offenses, as discussed above, or his fitness as a babysitter. Over the following weeks, the plaintiffs allege that Michael forced Z.W. to perform oral sex on him and forced A.W. to watch. Z.W. testified that on one occasion when he told Sandralee that Michael was abusing him, she said, "okay and just ignored it."[23] In April 2008, Z.W. told his mother about the abuse. Jane Doe-2 testified that she saw the fear in her son's eyes and never doubted his truthfulness about what had happened. She told Sandralee what Michael had done and, a day or two later, Michael and his father Chris appeared at her home, denying the abuse ever happened in an aggressive manner that caused her to feel intimidated.

---

[23]This testimony was given during a pretrial hearing held in the criminal prosecution of Michael Jensen for his sex crimes against victims J.T. and W.T. In Z.W.'s deposition taken in the instant matter, he described the ways that Michael would abuse him, including placing Z.W. in a cabinet in the basement of the Jensen home and refusing to let him out until Z.W. performed oral sex on Michael, who would insert his penis in a hole in the cabinet. Z.W. further testified that when he told Mrs. Jensen on one occasion that "Michael was doing stuff down in the basement," and more specifically that "Michael is making me suck his weiner[,]" he thinks she said,"I don't really care about that or something like that."

Jane Doe-2 further testified that she and her husband arranged a meeting with defendant Bishop Fishel during which they disclosed Michael's sexual abuse of Z.W., and Bishop Fishel indicated he would look into the matter. According to Jane Doe-2, when she saw Bishop Fishel at church approximately one week later, he told her that he had spoken to Michael; that he did not believe that Michael had abused Z.W.;[24] and that Z.W. might have been exposed to pornography. John Doe-2 testified to a separate but similar conversation with Bishop Fishel. When Bishop Fishel was deposed, he denied ever speaking to Jane Doe-2 about Michael's alleged sexual abuse of her son, and asserted any conversation he had with John Doe-2 did not involve sexual abuse. Bishop Fishel's testimony reflects that a few weeks later, he selected Michael Jensen and his brother Blaine Jensen to be First and Second Assistant to the Bishop, an honor within the Church.

---

[24]During her deposition, Jane Doe-2 was questioned regarding whether Bishop Fishel had said that the abuse had not happened or that he did not believe that it had happened and what her husband took from his response. Mrs. Doe-2 explained that her husband believes that church leaders

> are called of God and that they can have knowledge from God whether something is true or not. So [her husband's] belief that his bishop can say I know this didn't happen . . . meant [to her husband] that he [Bishop Fishel] had prayed about it and the Lord had told him it hadn't happened. And so in that sense, [her husband] could've felt like, yes, he [Bishop Fishel] would've known it [Michael's abuse of Z.W.] didn't happen[].

The defendants allege that neither of Z.W.'s parents "believed Z.W.'s account enough to report the abuse to the authorities" and John Doe-2 never disclosed any abuse of his son "by anybody." Conversely, Jane Doe-2 testified she and her husband considered reporting the abuse to authorities but after speaking to Bishop Fishel, they decided that Z.W. had been through enough; that his allegation would be questioned; that there would be persons who would not believe him because it would have been Z.W.'s word against Michael Jensen's denial; and that she did not want Z.W. to be ostracized.

By early 2009, Sandralee Jensen was no longer the Relief Society President but had assumed oversight of the Church's Cub Scout program. When Jane and John Doe-3 indicated their inability to attend her Cub Scout training one evening because someone would need to watch their young children, Sandralee offered to have her children babysit the Doe-3 children. Jane Doe-3 testified that Michael and a Jensen daughter babysat her children in the Jensen home, including her three-year-old son, C.H., who later disclosed Michael followed him into the bathroom, shut the door, and when he pulled down his pants to use the toilet, Michael touched his penis. Although the defendants state C.H. denied Michael had ever abused him, the plaintiffs point to contrary evidence in the appendix record and to the circuit court's denial of the defendants' motion for summary judgment on the claims of C.H. and his parents.

The record reflects that around this same time in 2009, Sandralee emailed her former bishop, Matt Whitcomb, expressing her concern that Michael posed a risk to her other children. She advised Mr. Whitcomb that she and her husband were "trying to think[] of different options to help protect [Michael] from himself" and asking whether there were any farmers in his area who would be willing to take in Michael. She also expressed to Mr. Whitcomb her comfort in seeking his help because he "knew some of the history."

In early 2010, Chris Jensen found eighteen-year-old Michael in the bedroom of his twelve-year-old sister K.J., who was lying on her bed. Mr. Jensen testified that he had Michael leave the room after which his daughter told him that Michael had lain on top of her and tried to kiss her. During her deposition, K.J. described this incident as Michael first lying down beside her on her bed, then "climb[ing] on top" of her after which he kissed her for what seemed like ten to twenty minutes, and also "possibly" moving his pelvis against her. She stated that she was terrified. From that point forward, the Jensens banned Michael from their home, although he stayed in a tent in their backyard at various times.

The Jensens met with Bishop Chris Vincent, who was a bishop in their Stake but was not their ward bishop, and reported Michael's abuse of K.J. Bishop Vincent testified that during this meeting, K.J. told him about a court case in another state where Michael was tried for hitting a girl. Bishop Vincent testified that he told no one else within the Church

16

about his meeting with the Jensens; that he agreed to counsel Michael; that he did not ask Michael about his abuse of K.J. or his earlier case that she had referenced; and that he gave Michael keys to the church building so he would have a safe place to sleep.

Between 2010 and June of 2011, Michael sometimes lived with Church families, including the Doe-4 family, who took him on a family trip to South Carolina. Jane Doe-4's son, J.C., who was Michael's friend, testified the only concern he was aware of Mrs. Jensen expressing was her worry that Michael would "mess[] up or hook[]up" with a girl at the beach. Michael went on that trip during which he allegedly abused the Doe-4s' eight-year-old daughter, A.B., touching her genitals over her clothing.[25] Sandralee Jensen testified that she knew Michael was living with the Doe-4 family, but she did not disclose anything to them about Michael's history of abuse, including his recent abuse of his sister K.J. As Sandralee explained, she did not feel any need to warn the Doe-4 parents because K.J. was more "developed" than the Doe-4s' daughter who was about the same age.

During this same time, the plaintiffs allege that the Church continued to hold Michael out as a trustworthy member of the community and, in early 2011, he was asked to serve as a substitute teacher in the Church's primary program and taught a class of four-year-

---

[25]The plaintiffs place A.B.'s age at five. During her deposition, A.B. testified that she was eight years old at the time.

17

old children. In June 2011, Michael was approved for a Church mission, which UD-1 indicated had been delayed while Bishop Fishel worked with Michael on his various issues.

In January of 2012, while Michael was on his mission, J.T. and W.T. disclosed to their parents, John and Jane Doe-1, that Michael had abused them five years earlier. Jane Doe-1 reported the abuse to the West Virginia State Police. Bishop Vincent informed President Grow about these allegations against Michael involving the Doe-1 children, including that he had called the Church's Helpline to advise Church officials in Utah of the West Virginia State Police investigation and that the State Police wanted to interview Michael. Although the Church brought Michael back to West Virginia early from his mission in Arizona, the plaintiffs allege that the Jensens and Church leaders met and agreed to not disclose his return to the police. The plaintiffs further allege Michael fabricated a story that he returned early from his mission due to a bicycle accident, and that Stake President Grow did nothing to correct the fabrication.

The Jensens state that Chris Jensen was deployed when Michael returned early from his mission, and because Mrs. Jensen did not want Michael living at home without his father there, Mr. Whitcomb, who was then a Stake High Councilor, agreed to let Michael live with him and his wife. Mr. Whitcomb testified that when his daughter and grandchildren planned a visit, he told Michael to find another place to live because there was not enough

18

room in his home for everyone.[26]  Mr. Whitcomb asked John Doe-5 if Michael could live with his family.  Although the Doe-5s had young children, the plaintiffs allege that neither Mr. Whitcomb, nor any Church official or defendant, told the Doe-5s the reason for Michael's early return from his mission, or about Michael's history of sexual abuse.  Mr. Whitcomb testified that he believed John Doe-5 was aware of the allegations against Michael based on conversations he had with John Doe-5, but he could not specifically recall the dates of those conversations.

John Doe-5 testified that both Stake President Grow and Bishop Fishel encouraged him to allow Michael to live in his home.  Michael Jensen lived with the Doe-5s from May 2012 until August 2012.[27]  John and Jane Doe-5's son M.S. testified Stake President Grow told him it was good that Michael was living with the Doe-5 family; that Michael was a "good guy;" and that he would be a "good role model" for M.S.  The plaintiffs allege that during this same time, Stake President Grow was "counseling" Michael on a regular basis.

---

[26]The plaintiffs contend the reasonable inference to be drawn is that Mr. Whitcomb did not want to risk Michael having access to his grandchildren.

[27]In August of 2012, the Doe-5s learned that Michael had been criminally charged with child sexual abuse.

19

The plaintiffs further allege that while Michael lived with the Doe-5 family, he touched the genitals of the Doe-5 boys, six-year-old T.S. and ten-year-old M.S., on several occasions. During therapy with a psychologist, T.S. described looking into the living room at his home on one occasion and seeing Michael holding his brother's head down to Jensen's crotch and "humping" his brother M.S.'s face; he drew a picture of what he had observed. The defendants allege the Doe-5 boys thought Michael's touching of them was accidental, while they were "wrestling," until their father suggested it was not. They add it was the Doe-5's oldest son, M.S.-2, who originally suggested that Michael live with their family.

In February of 2013, Michael Jensen was tried and convicted of the sexual abuse of the Doe-1 children, J.T. and W.T. During Michael's criminal trial, the Doe-2's son, Z.W., testified under Rule 404(b) about his own sexual abuse by Michael.[28]

After additional children came forward, alleging they had been sexually abused by Michael, the Church organized a support group meeting for their families in March 2013 in which some of the plaintiff families participated. UD-1 attended this support meeting, after which he reported on the meeting to Stake President Grow. The plaintiffs allege UD-1

---

[28]In August of 2013, Michael Jensen was ex-communicated from the Church based upon his alleged abuse of at least three Church families' trust. Stake President Grow testified during his deposition in the instant matter that when he visited Michael in jail, Michael admitted the victims' testimony at his criminal trial was true.

continued to keep President Grow informed of what he learned from the plaintiff families and of the conversations he had with John Doe-5's lawyer. The appendix record contains an email from UD-1 to Grow that begins, "As promised here is what we [he and John Doe-5] talked about last night."[29]

On September 16, 2013, the plaintiffs filed their complaint in the circuit court against the Church defendants and the Jensens (Chris, Sandralee, and Michael) alleging civil conspiracy, fraud, intentional infliction of emotional distress, and various negligence claims; they also asserted an assault and a battery claim solely against Michael Jensen. On February 3, 2014, the plaintiffs filed an amended complaint naming UD-1 as a defendant on their claim of civil conspiracy.

Following extensive discovery, multiple motions for summary judgment were filed, as well as numerous motions in limine. During a status conference held on August 31, 2015, the circuit judge, expressing his concern regarding the impact that a six-week trial would have on his docket, identified a need to find ways to shorten the trial's duration.

On December 4, 2015, prior to its in limine rulings, the circuit court entered an order granting UD-1's motion for summary judgment, finding the plaintiffs could not

_____

[29]In that digital exchange, UD-1 counseled John Doe-5 against pursuing a legal claim against the Church, citing the eternal consequences of doing so.

21

prove the elements of conspiracy against him. Through its order entered on December 30, 2015, the circuit court granted several of the defendants' motions in limine, effectively eliminating much of the plaintiffs' evidence offered in opposition to the defendants' motions for summary judgment on the conspiracy claim.[30] Although the circuit court had previously indicated its intent to allow the plaintiffs' conspiracy claim against the remaining defendants to go to trial, the following day, December 31, 2015, the court entered an order granting summary judgment in favor of the remaining defendants on that claim. After observing in this order that it had "eliminated much of the circumstantial evidence that Plaintiffs intended to use in support of their conspiracy claim," the circuit court found the plaintiffs had no direct evidence of a conspiracy and no evidence of a "concerted action by the alleged conspirators," a "common plan or mutual agreement by the alleged conspirators," or any evidence that "the alleged conspirators combined and agreed to violate a duty owed to the Plaintiffs."

On January 11, 2016, the circuit court entered an order of final judgment pursuant to West Virginia Rule of Civil Procedure 54(b) concerning its summary judgment orders. The circuit court ruled these orders were final because they entirely disposed of all claims against UD-1 and all conspiracy claims against all defendants. No party objected to the entry of this order. This appeal followed.

---

[30]The circuit court's in limine rulings are addressed more fully in section III.B., *infra*.

22

## II.  Standard of Review

The plaintiffs have appealed two summary judgment orders.  Our review is plenary.  Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo*.").  To the extent other standards apply to our review of the circuit court's Rule 54(b) certification and its evidentiary rulings, those standards are set forth below.

## III.  Discussion

The circuit court certified its summary judgment orders under West Virginia Rule of Civil Procedure 54(b).  Following our consideration of the Rule 54(b) certification, we will then address the circuit court's in limine rulings and conclude with our review of the summary judgment decisions.

## A.  Rule 54(b) certification

In its Rule 54(b)[31] order, the circuit court found that its summary judgment orders had disposed of the only claim (conspiracy) asserted against UD-1, as well as the conspiracy claim against all other defendants, and that there was no just reason for delaying entry of final judgment with respect to those claims.  As the circuit court explained:

> (a) appellate review of those orders and any necessary evidentiary rulings will promote judicial efficiency by

[31]*See supra* note 6.

23

maximizing the chance that this lengthy and complex case is tried only once, with the benefit of definitive rulings on the admissibility of certain evidence and the viability of certain claims; and (b) the special nature of this case, where sexually abused children will be called upon to testify, strongly supports appellate review of these matters before trial. Testifying, and reliving their abuse, is re-traumatizing, and whatever appropriate steps are available should be taken to ensure that this happens only once.

All parties assented to the circuit court's Rule 54(b) ruling as being proper and meeting the criteria of Rule 54(b) at the time it was made. Notwithstanding the defendants' agreement to entry of the Rule 54(b) order below, and the fact they did not file a motion to dismiss this appeal or cross-assign as error the circuit court's Rule 54(b) certification, they now argue that this interlocutory appeal under Rule 54(b) is improper because civil conspiracy merely extends liability for an underlying tort, which makes it inseparable from the merits of the underlying torts that remain pending below.[32] For the reasons set forth below, we disagree.

Our review of the circuit court's Rule 54(b) certification is guided by the following test:

> In reviewing a circuit court's certification under Rule 54(b) of the West Virginia Rules of Civil Procedure, this Court applies a two-prong test. First, we scrutinize *de novo* the circuit court's evaluation of the interrelationship of the claims, in order

---

[32]UD-1 does not challenge the Rule 54(b) certification.

24

to decide whether the circuit court completely disposed of one or more claims, which is a prerequisite for an appeal under this rule. As to the second prong of the inquiry under the rule–whether there is any just reason for delay–this Court accords the circuit court's determination considerably more deference than its first-prong determination. The circuit court's assessment that there is "no just reason for delay" will not be disturbed unless the circuit court's conclusion was clearly unreasonable, because the task of balancing the contending factors is peculiarly one for the trial judge, who can explore all the facets of a case.

Syl. Pt. 1, *Province v. Province*, 196 W.Va. 473, 473 S.E.2d 894 (1996).

Regarding the first *Province* prong, the circuit court found that its summary judgment rulings had disposed of the plaintiffs' conspiracy claim against UD-1, which was the only cause of action asserted against him, and their conspiracy claim against all other defendants. We have previously recognized conspiracy as a separate claim. As we stated in *Dunn v. Rockwell,* 225 W.Va. 43, 689 S.E.2d 255 (2009), "'[t[he law of this State recognizes a cause of action sounding in civil conspiracy.'" *Id.* at 56, 689 S.E.2d at 268 (quoting *Kessel v. Leavitt*, 204 W.Va. 95, 128, 511 S.E.2d 720, 753 (1998)). The fact that a civil conspiracy claim requires an underlying tort or harm resulting from the conspiracy does not make it any less a claim that can be disposed of separately from the remaining causes of action.

25

The defendants assert that civil conspiracy is inseparable from the merits of the underlying torts, is based on the same facts, and seeks the same recovery. While the same facts might be relevant to the conspiracy claim, as well as the negligent and intentional tort claims that remain pending below, this does not preclude the circuit court's Rule 54(b) certification of its final ruling on the plaintiffs' conspiracy claim. Indeed,

> "[w]hen the mischief is accomplished, the conspiracy becomes important, as it affects that means and measure of redress; for the party wronged may look beyond the actual participants in committing the injury, and join with them as defendants all who conspired to accomplish it. The significance of the conspiracy consists, therefore, in this: That it gives the person injured a remedy against parties not otherwise connected with the wrong. It is also significant as constituting [a] matter of aggravation, and as such tending to increase the plaintiff's recovery."

*Gosden v. Louis*, 687 N.E.2d 481, 497 (Ohio Ct. App. 1996) (citation omitted). Further, a conspiracy claim "enlarge[s] the pool of potential defendants from whom a plaintiff may recover damages and, possibly, an increase in the amount of those damages[.]" *Id.* at 498; *see also Premier Therapy, L.L.C. v. Childs*, Nos. 14 CO 0048, 15 CO 0028, __ N.E.3d __, 2016 WL 6966387 (Ohio Ct. App. Nov. 18, 2016) (observing that where additional damages are awarded on conspiracy claim there must be evidence to support damages award). In the case at bar, the plaintiffs argue that "conduct that establishes conspiracy liability, but not separate tort liability, could cause harms not recoverable on the separate tort claims."

26

We have previously recognized the possibility of separate damages for conspiracy. In *Slack v. Kanawha County Housing and Redevelopment Authority*, 188 W.Va. 144, 423 S.E.2d 547 (1992), after ordering the reinstatement of the verdict for the plaintiff's emotional injuries awarded on her invasion of privacy claim, we addressed the errors the plaintiff asserted concerning her conspiracy claim. In *Slack*, "the only damages the plaintiff proved . . . were damages for emotional distress and mental anguish." *Id.* at 155, 423 S.E.2d at 558. We recognized the "identicality of the damage claim asserted under the civil conspiracy theory," but declined to address "whether, from a substantive standpoint, there was sufficient evidence to prove such a theory." *Id.* at 156, 423 S.E.2d at 559. On remand, we instructed that "the plaintiff is free to develop the claim for civil conspiracy, but unless the damages are separate and distinct from those already obtained on the invasion of privacy verdict, there can be no recovery under *Harless*."[33] *Slack*, 188 W.Va. at 156, 423 S.E.2d at 559; *see also Wells v. Smith*, 171 W.Va. 97, 105-06, 297 S.E.2d 872, 880 (1982) (*overruled on other grounds in Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991) (finding that had "jury been properly instructed on the appellants' conspiracy theory they may well have returned a verdict for compensatory damages against Settimio by virtue of the evidence of his participation in the conspiracy").

---

[33]*See* Syl. Pt. 7, *Harless v. First Nat'l Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982) ("It is generally recognized that there can be only one recovery of damages for one wrong or injury. Double recovery of damages is not permitted; the law does not permit a double satisfaction for a single injury. A plaintiff may not recover damages twice for the same injury simply because he has two legal theories.").

27

While the deference this Court affords to a circuit court's Rule 54(b) certification under the first prong of *Province* is clear,[34] we afford even greater deference to the circuit court's decision under the second prong of *Province*. As indicated above, the circuit court found no just reason for delay because appellate review of its orders would "promote judicial efficiency by maximizing the chance that this lengthy and complex case is tried only once, with the benefit of definitive rulings on the admissibility of certain evidence and the viability of certain claims[.]" These findings "will not be disturbed unless the circuit court's conclusion was clearly unreasonable[.]" *Province*, 196 W.Va. at 475, 473 S.E.2d at 896, syl. pt. 1, in part.

Under the authority set forth above, and upon giving the requisite deference to the circuit court's Rule 54(b) ruling, we conclude there was no abuse of discretion in its determination that the summary judgment rulings completely disposed of the plaintiffs' conspiracy claims. Further, we give substantial deference to and concur in the circuit court's conclusion that "the special nature of this case, where sexually abused children will be called upon to testify, strongly supports appellate review of these matters before trial."[35]

---

[34]*See State ex rel. Consolidation Coal Co. v. Clawges*, 206 W.Va. 222, 228, 523 S.E.2d 282, 288 (1999) (citing *Province* and stating "[t]hat this Court affords great deference to the intent of the circuit court in its determination of whether an order is final for purposes of Rule 54(b) certification is indisputable.").

[35]Although the defendants assert there is no indication that it would be traumatizing if the minor plaintiffs had to testify more than once, citing the multiples times each has
(continued...)

28

Accordingly, we find no abuse of discretion in the circuit court's Rule 54(b) certification, and we will exercise our appellate jurisdiction in this matter.

## B. In limine rulings

Having upheld the circuit court's Rule 54(b) certification, we observe that

> "'[w]here an appeal is properly obtained from an appealable decree either final or interlocutory, such appeal will bring with it for review all preceding non-appealable decrees or orders, from which have arisen any of the errors complained of in the decree appealed from, no matter how long they may have been rendered before the appeal was taken.' Point 2, syllabus, *Lloyd v. Kyle*, 26 W.Va. 534 [1885]." Syllabus point 5, *State ex rel. Davis v. Iman Mining Co.*, 144 W.Va. 46, 106 S.E.2d 97 (1958).

Syl. Pt. 6, *Riffe v. Armstrong*, 197 W.Va. 626, 477 S.E.2d 535 (1996). Necessarily intertwined with the circuit court's summary judgment rulings entered in favor of the Church defendants and the Jensen parents are its antecedent in limine rulings.[36]

Notwithstanding our holding in *Riffe*, the Church defendants strongly urge this Court to refuse consideration of the circuit court's in limine rulings. Citing our "finality

[35](...continued)
already related what happened, we agree with the circuit court's concern. As we recently recognized, "each new publication [of child pornography] would cause new injury to the child's . . . emotional well-being." *State v. Riggleman*, __ W.Va. __, __, 798 S.E.2d 846, 852 (2017) (citation omitted). Similarly, a child's emotional well-being could be harmed each time the child is required to recount his or her abuse.

[36]As indicated previously, the circuit court entered summary judgment in favor of UD-1 prior to issuing the subject in limine rulings.

rule," they argue that the plaintiffs cannot demonstrate that the in limine rulings "were so integral to the conspiracy order as to 'give rise' to the purported errors contained therein"; that "[n]othing in the circuit court's expressed reasons for granting summary judgment suggests that the outcome would have been different if some or all of the excluded evidence had not been excluded"; and that "[t]here is no meaningful way for this Court to determine that any excluded evidence, much less which evidence, resulted in the alleged error in the conspiracy ruling." The Jensen parents take a somewhat different stance. They first argue that this Court should not review the in limine rulings, but then acknowledge that the instant appeal is "tied up with the evidentiary rulings that have been decided," adding that any review of those rulings should be limited "to the extent they impact the outcome of the summary judgment ruling on the conspiracy cause of action."

Rejecting the notion that the in limine rulings are distinct from the summary judgment rulings, the plaintiffs maintain that this Court can properly review these evidentiary rulings under *Riffe*. They highlight the circuit court's statement in its summary judgment order that it had "eliminated much of the circumstantial evidence that Plaintiffs intended to use in support of their conspiracy claim" through its in limine rulings. Although the defendants argue that any alleged error in the summary judgment ruling did not arise from the prior in limine rulings, we find that the circuit judge's comments made during the Rule 54(b) hearing indicate otherwise: "I don't know how you get around the motions in limine

. . . . aren't you going to have to look at those as part of the appeal? . . . I don't know how you cut that out of it."[37]  It is clear to this Court, as well, that the in limine rulings and the summary judgment rulings are inextricably entwined.

Typically, a motion in limine is "a pre-trial request . . . that the court not permit certain anticipated evidence to be admitted in the trial and not be seen or heard by the jury."[38] While the circuit court's in limine rulings may have been made, in part, for such purposes, it is equally clear that these in limine rulings allowed the circuit court to evade review of that evidence and the attendant duty to draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party, as is required of a court in ruling upon a motion for summary judgment.[39]  Other courts have cautioned against proceeding in such a manner.

In *C & E Services, Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316 (D. D.C. 2008), the court found that "a motion *in limine* should not be used to resolve factual disputes or weigh evidence[;]" rather, such should be accomplished through "a motion for summary judgment, with its accompanying and crucial procedural safeguards." *Id.* at 323.  Similarly,

---

[37]We note that defense counsels' comments at this same hearing reflect contemplation of the necessity of this Court's review of the in limine rulings.

[38]*State v. Poling*, 207 W.Va. 299, 307 n.1, 531 S.E.2d 678, 686 n.1 (2000).

[39]The standards and guidelines applicable to a circuit court's consideration and ruling upon a motion for summary judgment are discussed *infra*, section III.C.

in *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353 (7th Cir. 1996), the court determined that the sufficiency of evidence concerning lost profits was for summary judgment or judgment as matter of law, not a motion in limine. *Id.* at 1363; *see also Meyer Intellectual Prop.'s Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1378 (Fed. Cir. 2012) (observing that "motion in limine is not the appropriate vehicle for weighing the sufficiency of the evidence"); *Williams v. Johnson*, 747 F. Supp. 2d 10, 14 (D. D.C. 2010) ("Motions *in limine* are designed to narrow the evidentiary issues at trial. *** In light of their limited purpose, motions *in limine* 'should not be used to resolve factual disputes,' which remain the 'function of a motion for summary judgment'") (citation omitted); *Ferguson v. Marshall Contractors, Inc.*, 745 A.2d 147, 150-51 (R.I. 2000) (finding trial judge had improperly used motion in limine to effectively make summary judgment ruling).

While not expressly considering the propriety of utilizing in limine rulings to resolve factual disputes, this Court has addressed the effects of a circuit court's elimination of evidence through an in limine ruling to facilitate summary judgment. In *San Francisco v. Wendy's International, Inc.*, 221 W.Va. 734, 656 S.E.2d 485 (2007), the circuit court excluded the testimony of the plaintiffs' causation experts through an in limine ruling after which it "went on to grant summary judgment to the defendant, on the basis that the plaintiffs did not have sufficient evidence to support their claim." *Id.* at 738, 656 S.E.2d at 489. This Court concluded that

32

> [h]aving found that the circuit court erred in excluding both of the appellants' causation experts, we now find that the appellants made a sufficient showing on an essential element of the case that they had the burden to prove. Accordingly, because it now appears from the record that genuine issues of fact exist to be tried, we find that the circuit court erred in granting summary judgment.

*Id.* at 751, 656 S.E.2d at 502. Similarly, in *Buckhannon Sales Co., Inc. v. Appalantic Corp.*, 175 W.Va. 742, 338 S.E.2d 222 (1985), the circuit court first granted the defendant's motion in limine "to prevent the introduction of parol testimony concerning the various documents, contending that the court should not admit parol evidence and that the terms of the various contracts were unambiguous." *Id.* at 744, 338 S.E.2d at 224. The court later granted summary judgment in favor of the defendant. After analyzing the parol evidence rule, this Court reversed the award of summary judgment after determining that "the motion in limine was erroneously sustained" and that "the parties should have the opportunity to explain the agreements." *Id.* at 745, 338 S.E.2d at 224.

Although the defendants contend there is nothing in the circuit court's reasoning for granting summary judgment that would suggest a different outcome had some or all of the excluded evidence not been eliminated, we disagree. The fact that the circuit court first eliminated a large portion of the plaintiffs' circumstantial evidence offered in support of their conspiracy claim before it granted the Church defendants' and the Jensen parents' summary judgment motions on that claim strongly suggests otherwise. While the

33

defendants afford little significance to the circuit court's pronouncement that it had eliminated much of the plaintiffs' evidence through its prior in limine rulings, we find the statement reveals precisely what the circuit court hoped to accomplish.

Turning to the circuit court's in limine rulings, we first observe that "[a] trial court's ruling on a motion in limine is reviewed on appeal for an abuse of discretion."[40] Syl. Pt. 1, *McKenzie v. Carroll Intern. Corp.*, 216 W.Va. 686, 610 S.E.2d 341 (2004). Our consideration necessarily begins with a review of the evidentiary rules applicable to the circuit court's rulings. Although the circuit court's in limine rulings are sparse in terms of any factual or legal analysis, the order does reflect a cursory application of Rules 401 and 403 of the West Virginia Rules of Evidence.

Under West Virginia Rule of Evidence 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *Id.* Relevant evidence may be

---

[40]We reject the plaintiffs' request that we apply a de novo review to these evidentiary rulings. The issues before us do not involve an interpretation of the rules of evidence, which would require a de novo review; rather, we review the circuit court's application of those rules to exclude evidence through its in limine rulings. *See Lacy v. CSX Transp. Inc.*, 205 W.Va. 630, 646, 520 S.E.2d 418, 434 (1999) ("'[A] trial court's ruling on the admissibility of testimony is reviewed for an abuse of discretion, "but to the extent the [circuit] court's ruling turns on an interpretation of a [West Virginia] Rule of Evidence our review is plenary."' *State v. Sutphin*, 195 W.Va. 551, 560, 466 S.E.2d 402, 411 (1995) (citations omitted)[.]").

excluded, however, "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." W.Va. R. Evid. 403, in part.

In all but one of the in limine rulings being challenged, the circuit court found, *inter alia*, that the evidence would be "wasting time" and would cause "undue delay," which are Rule 403 considerations. The circuit court did not explain in its order why this evidence would be a waste of time or cause undue delay, nor did it offer any analysis as to why this evidence is unfairly prejudicial or how that unfair prejudice substantially outweighs its probative value. Importantly, however, "wasting time" and "undue delay" should not be employed to exclude relevant evidence whose probative value substantially outweighs the risk presented by these concerns. Indeed, notwithstanding the circuit court's stated desire to find ways to shorten what will clearly be a lengthy trial in this matter, care must be taken to ensure that efficiency considerations do not lead to the exclusion of highly probative evidence. *See U.S. v. Siegel*, 536 F.3d 306, 320 (4th Cir. 2008) ("sympathiz[ing] with the district court's concern about the length and complexity of the trial"; agreeing that "the district court excluded the Other Crime Evidence without sufficiently considering the importance of the evidence to the government's case"; and finding that the district court had "other tools available to it to ensure that the trial proceeds as expeditiously as possible");

35

*Johnson v. Ashby*, 808 F.2d 676, 678 (8th Cir. 1987) (recognizing trial court's need to control length of trial but also observing that "it may be an abuse of the trial court's discretion to exclude probative, non-cumulative evidence simply because its introduction will cause delay"). We bear these cautions in mind as we consider the circuit court's in limine rulings[41] that have been challenged in this appeal.

### 1. Exclusion of Utah Sex Offense Evidence

The circuit court ruled that the allegations of the Church's influence in the juvenile criminal proceedings in Utah were based on "Michael's cryptic boast to a friend"[42] and other circumstantial evidence of similarly "limited probative value," which was substantially outweighed by a danger of unfair prejudice to the defendants, as well as concerns rooted in confusing the issues, wasting time, and undue delay. The circuit court found a dissimilarity in conduct between Michael's criminal offenses in Utah and the instant abuse allegations, adding that the Utah court records contained more information than either the Jensen parents, Michael's paternal grandfather, or Bishop Swenson would have

---

[41]Confining our decision to the bases cited in the circuit court's December 30, 2015, in limine order, we recognize that other evidentiary challenges may arise concerning this same evidence, as the evidence unfolds at trial.

[42]As indicated previously, Michael told his friend J.C. (Jane Doe-4's son), that he had been in legal trouble with a girl in Utah before moving to West Virginia, and that his grandfather "was in a leadership position for the church . . . [and] helped take care of whatever needed to be taken care of."

contemporaneously been aware of. Regarding the SBRA,[43] which was part of the Utah

proceeding, the circuit court found there was no evidence that the Jensen parents or Church

leaders ever saw the SBRA;[44] therefore, it had low probative value that was substantially

outweighed by its potential for confusing the issues, undue delay, and wasting time.[45]

The plaintiffs assert that these rulings are in error because the events in Utah

marked the inception of the concerted action they have alleged. They insist that the direct

evidence concerning Michael's early history of sex offenses in Utah is intrinsic to their

claims, particularly where "disputes abound" regarding when the defendants had notice that

Michael was a risk to children,[46] whether they concealed both the abuse and the risk, and

whether Michael should have been sponsored as a fit babysitter for Church families in West

[43]*See supra* note 10.

[44]The plaintiffs contend the reasonable inferences to be drawn from their circumstantial evidence in this regard demonstrate that the Jensen parents are not being truthful when they claim they did not see the SBRA.

[45]The circuit court also found that the records from the Utah proceeding should remain "confidential and inadmissible absent an order from the appropriate Utah court authorizing its release." Even assuming, *arguendo*, that a Utah court could control the admission of evidence at trial in West Virginia, the fact remains that these records were previously released in numerous ways without a Utah court order, but in accordance with Utah court rules, including to the West Virginia State Police. They were also produced in response to the Church's subpoena to the West Virginia State Police and by the Jensen parents in discovery; they have been used in multiple ways in this litigation, including by experts in rendering opinions.

[46]The defendants discount Michael's sex offenses in Utah in many ways, including that there was no evidence that he had abused any child before 2007. However, Michael's victims in Utah were minors.

Virginia or as a boarder in their homes. Regarding the circuit court's finding that this evidence would be a "waste of time" because the Utah offenses were too "dissimilar" to Michael's later abuse of children, the plaintiffs posit the question: What parent would not want to know that the person being proffered to babysit his or her child or board in his or her home had prior sexual offenses, and what parent would not think that persons with knowledge of those offenses had a duty to disclose that knowledge before urging unsuspecting parents to allow that person into their home and/or to babysit their children?[47]

Regarding the circuit court's acceptance of the Jensens' denial they never saw the SBRA or knew of its contents, the plaintiffs assert this was a credibility determination made by the circuit court in the face of contrary circumstantial evidence that calls into question the veracity of the Jensens' denial. The plaintiffs further argue that it should be for a jury, not the circuit court, to decide whether there is a connection between Michael's Utah sex offenses and his later abuse of the minor plaintiffs and whether the Church influenced the outcome of the proceeding in Utah through the involvement of Michael's paternal grandfather, who held powerful positions within the Church. Maintaining that the contested

---

[47]Although the defendants argue that no "Church leader" placed Michael in babysitting positions, the plaintiffs look to the following allegations to disprove this contention: that Sandralee Jensen in her role as Relief Society President arranged for Michael to babysit several of the minor plaintiffs; that in her later role as a scout leader for the Church she arranged for Michael to babysit for another plaintiff family; and, later, after Michael was banned from the Jensen home for sexually abusing his twelve-year-old sister, Church leaders assisted and recommended Michael's placement as a boarder with yet another family.

facts concerning what happened in Utah, whether the conduct was serious, and whether it was predictive of Michael being a threat to re-offend were all disputed, the plaintiffs assert the circuit court erred in resolving these disputed facts in favor of the defendants before also finding that this evidence had limited probative value and would be a waste of time.

Rejecting the plaintiffs' arguments, the defendants contend the circuit court did not abuse its discretion because the plaintiffs have no evidence that Michael, his parents, or any Church leaders ever saw the SBRA or knew of its contents and that the plaintiffs have distorted the record when they claim the Jensen parents knew Michael was a danger to children because they no longer allowed him to babysit his younger siblings.[48] Arguing further, the defendants state that the circuit court properly excluded the SBRA, which has low probative value given the dissimilarities[49] between Michael's Utah conduct and the instant abuse allegations, and which value was substantially outweighed by its potential for

---

[48]Serving to further highlight the innumerable factual disputes in this matter, the defendants contend that the SBRA evaluator concluded that Michael posed a low to moderate risk to act out again with girls his age and that he was not a risk to his prepubescent sisters. However, the defendants omit that the SBRA evaluator also concluded that Michael needed "to be supervised with *any female*, *including his sisters* . . . until his therapist considers that his risk is reduced." (emphasis added). While the defendants contend that proof of the therapy's completion was provided to the Utah court, the plaintiffs allege there is no "proof" of completion in Michael's Utah court file, which was confirmed during the testimony of defense expert Frank Yannelli. Mr. Yannelli is an assistant prosecutor in the county where Michael was prosecuted in Utah. With the permission of his supervisor, who is the elected Utah County Attorney, Mr. Yannelli is a paid expert for the Church in the case at bar.

[49]This Court is confident that the parties will marshal their experts and other evidence in support of their respective positions on this issue for purposes of trial.

issue confusion, undue delay, and wasting time. The defendants contend that the plaintiffs have no evidence of Church influence in Michael's Utah proceedings; that those persons involved in that proceeding, including the prosecutors, have testified they were not influenced in their handling of Michael's prosecution; and that Michael's parents and grandfather participated in the proceeding as any parent or grandparent would in such circumstances.

Based on our review of this evidence, we conclude that the circuit court abused its discretion in excluding evidence of Michael Jensen's juvenile criminal proceeding in Utah. Evidence of the Utah offenses, including the SBRA, are clearly relevant and probative of who knew what and when, which is at the heart of the plaintiffs' conspiracy claim, and is probative of notice of Michael's risk to re-offend sexually.[50] Moreover, it is neither speculative nor unreasonable to conclude that a jury might infer that Michael's parents had access to information associated with their minor son's criminal proceeding, including the SBRA,[51] which cautioned that Michael should be supervised with *any* female, including his young sisters, until his therapy was completed and the risk reduced. What purpose would

---

[50]The plaintiffs allege that the Church's expert admitted that Michael's sex offenses in Utah "portended an increased risk of re-offending with a range of victims, including young children."

[51]We are persuaded by the plaintiffs' argument that the Jensens, as his parents, could obtain the SBRA as Michael's power of attorney under Utah judicial rules. We further observe that parents may have access to private court records if the subject of that record is their unemancipated minor child. Ut. Jud. Admn. R. 4-202.03(4)(B).

such a warning serve if it were not shared with the very persons intended to implement the protections addressed by the caution? Moreover, the parties' experts have relied, in part, on the SBRA in rendering their opinions. Further, regarding the Church's alleged influence in that proceeding, it is difficult to ignore Michael's friend J.C., who testified that Michael said he had been in legal trouble with a girl in Utah before moving to West Virginia, but his grandfather "was in a leadership position for the church . . . [and] helped take care of whatever needed to be taken care of." While the circuit court found this statement to be merely a "boast," Michael has declined to testify in this matter; thus, there is no basis for such conclusion.

Just because highly probative evidence may prejudice the opposing party, that basis alone does not warrant the exclusion of such evidence which is the case here. Moreover, concerns about the length of trial do not warrant the exclusion of this evidence based on waste of time, undue delay or confusion for a jury. It will be for a jury to resolve any factual disputes associated with this evidence, draw reasonable inferences from this evidence, as it may, and determine whether this evidence supports the plaintiffs' conspiracy claim.

41

## 2. Exclusion of evidence of Michael Jensen's alleged assault of J.M. in 2007

The circuit court found the evidence of Michael Jensen's alleged assault upon J.M. in 2007 to be of limited probative value for purposes of establishing notice that Michael was a danger to young children, and that any probative value of this evidence was substantially outweighed by its potential for issue confusion, undue delay, and "wasting time during what is expected to be a long trial." The plaintiffs argue the circuit court erred by rejecting their argument that whether this evidence provides notice that Michael was a risk to a range of potential victims is a jury question. Arguing further, the plaintiffs maintain that Sandralee Jensen, who was a Church officer at the time, connected the J.M. assault with Michael's offenses in Utah, bringing both matters to the attention of Bishop Whitcomb—all of which occurred before Michael was "placed as a babysitter for the Doe-1 family in November 2007, the Doe-2 family in February/March, 2008, and into the homes of the other plaintiffs thereafter."

The defendants respond that no local Church leader knew anything about the J.M. incident and that, at most, Sandralee Jensen may have mentioned this incident in a "passing comment" to Bishop Whitcomb. They further argue it was not until J.M.'s deposition in May of 2014 that either the Jensens or anyone else learned that the incident had been anything but consensual. Finally, they contend that regardless of what they knew about this incident, it "would not act as a predictor that Michael might abuse young children."

We find the relevancy and probity of this evidence outweighs any concern for issue confusion, undue delay, or wasting time. This is simply another piece of evidence from which a jury could infer a conspiracy to conceal incidents of Michael's sexual abuse of others, including J.M., and to suppress information of the ongoing danger and threat that he posed. Certainly, Sandralee Jensen, who is alleged to be part of the conspiracy and who was then serving as Relief Society President, had concerns at the time, prompting her to ask J.M. whether she was okay and "do we have a problem?" Mrs. Jensen also reported the incident to Bishop Whitcomb during a conversation in which she raised the topic of Michael's offenses in Utah. Accordingly, we find that the circuit court abused its discretion in excluding this evidence.

### 3. Exclusion of any reference to an alleged 2006-2007 Stake High Council meeting

The plaintiffs have circumstantial evidence that a Stake High Council meeting occurred in either 2006 or 2007 during which, *inter alia*, Michael Jensen's abuse of a younger sister was allegedly discussed, and Stake President Grow asked UD-1 to monitor Chris Jensen and report back to him, which UD-1 agreed to do. The circuit court excluded this evidence, finding the plaintiffs had no "firsthand evidence of such a meeting" and the probative value of the plaintiffs' hearsay evidence, even if the court were to find it admissible, was substantially outweighed by a danger of undue delay and a waste of time.

In making this particular in limine ruling, the circuit court referenced, without discussion, its earlier order granting summary judgment in favor of UD-1. The circuit court found in its prior order that UD-1 was indisputably not a member of the Stake High Council until 2008; that the transcript of plaintiffs' counsel's interview of UD-1 reflected that UD-1 did not specify a date for this Stake High Council meeting; that everyone who was indisputably a member of the Stake High Council at that time had denied that any such meeting took place; that the plaintiffs' assertion that the meeting was prompted by Michael's abuse of a younger sister was not supported by the record; and that the only record evidence of a sexual incident between Michael and a younger sister was the subsequent incident that occurred in 2010 with his then twelve-year-old sister, K.J.

The plaintiffs argue there is extensive evidence that this meeting took place within the time frame they allege, including separate conversations that John Doe-5 had with Stake President Grow; President Grow's executive secretary at the time, Tony Naegle; and UD-1. They allege UD-1 told multiple plaintiffs about these Stake discussions during a parent support group meeting in 2013, referencing the 2007 time frame both then and when he was interviewed by plaintiffs' counsel. Rejecting these arguments, the defendants essentially echo the circuit court's findings, including that persons who served on the Stake High Council during that time frame have all denied that such discussion regarding the Jensens ever took place.

44

We find the circuit court abused its discretion by crediting the defendants' denials that this meeting took place when the record contains circumstantial evidence to the contrary. While the evidence is clearly conflicting, it will be for the jury to assess the credibility of witnesses, to determine whether this Stake High Council meeting took place and, if so, whether concerns regarding Michael's abuse of others was discussed.[52] A jury's resolution of this conflicting, but relevant and probative evidence, will necessarily bear on who knew what and when, whether Church leaders were on notice of the risk that Michael posed, and whether the evidence supports the plaintiffs' conspiracy claim.

#### 4. Exclusion of any reference to Michael Jensen's sister, R.J., allegedly exhibiting signs of sexual abuse

The circuit court found there is no direct evidence that abuse of R.J.[53] was "discussed at a high council meeting" or that Michael was the abuser, even if R.J. had been abused. It then concluded that the "very low probative value of Plaintiffs' circumstantial evidence of the alleged abuse of R.J. is substantially outweighed by its potential for confusing the issues, undue delay, and wasting time." The plaintiffs contend the circuit court misunderstood their intended use for this evidence, which is not to argue that R.J. was abused; rather, they contend that she "exhibited well-accepted signs of abuse" at a time when

---

[52]The circuit court also mentioned that the plaintiffs' evidence was hearsay. Any hearsay objections can be addressed at trial.

[53]*See supra* note 16.

45

both Jensen parents held high positions within the Church; were aware of their son's history of sexual offenses; and when Sandralee Jensen, who was aware of this incident, was offering Michael's babysitting services to Church families in her role as Relief Society President. The defendants counter that even if R.J.'s behavior were suggestive of prior sexual abuse, this evidence has limited, if any, probative value because the plaintiffs do not allege that any Church leader was aware of the incident;[54] there was no attempt to conceal the event; and the Jensen parents never interpreted R.J.'s behavior as being indicative of sexual abuse by anyone, including Michael.

We find the probative value of this evidence outweighs any concern for issue confusion, undue delay, or wasting time. Having previously found that the plaintiffs' circumstantial evidence concerning the Stake High Council meeting in the 2006-2007 time frame was improperly excluded by the circuit court, the relevancy and probative value of the evidence concerning R.J. becomes more clear. Although the defendants argue the plaintiffs have concocted this theory of sexual abuse of R.J.,[55] if a jury finds there was a 2006-2007

_____

[54]These arguments are inconsistent with evidence that the Jensen parents held leadership positions in the Church during this time frame. Further, if no effort was made to conceal the incident, then a jury could reasonably infer that other Church leaders would have learned of this incident, which was arguably further evidence of notice as to Michael's improper sexual propensities.

[55]The defendants state that once the plaintiffs realized their original theory that Michael's abuse of his sister, K.J., could not have been the subject of Stake discussions in 2006-2007 because the abuse of K.J. occurred in 2010, the plaintiffs created this theory that

(continued...)

Stake High Council meeting during which the abuse of a Jensen daughter was discussed, the jury could conclude that R.J. was that daughter, and that related concerns prompted Stake President Grow to ask UD-1 to monitor Chris Jensen.[56] Accordingly, we find the circuit court abused its discretion by excluding this evidence.

### 5. Exclusion of 1999 purported Helpline form document

As part of the evidence supporting their conspiracy claim, the plaintiffs planned to offer at trial a Helpline form document to show how the Church's abuse prevention and response systems are intended to protect the Church from liability rather than to prevent abuse, as the Church proclaims. The plaintiffs state this document was provided to their counsel by Unnamed Witness-1, who has averred that she telephoned the Church's Helpline in 1999 concerning an abusive situation and that when the documents she had forwarded were later returned to her, this particular form document was included.[57] Although the form

---

[55](...continued)
R.J. showed signs of sexual abuse. *See supra* note 16.

[56]Again, Stake President Grow has denied tasking UD-1 to monitor Chris Jensen and report back on his observations. This is a disputed issue of fact that a jury will necessarily decide through its credibility determinations.

[57]The appendix record reflects that this form document was completed by Allen Gundry in 1999, when he received a call to the Helpline from Unnamed Witness-1. According to the deposition testimony given in 2000 in an unrelated matter by Harold Brown, who was then the managing director of the Welfare Services Department of the Church, Mr. Gundry was the person primarily responsible for the Helpline at that time. Mr. Brown testified that the form would have been developed by the Church's Family Services with help
(continued...)

47

appears on its face to be an instruction sheet for Helpline workers taking calls, the circuit

court excluded the form, observing that the only Helpline call made in the instant matter was

made by Bishop Vincent more than twelve years after the date on the form. The lower court

further found the document to be unauthenticated hearsay and irrelevant.

While this form is very much in dispute, the Church defendants assert "[e]ven

the purported Helpline form produced by Plaintiffs" supports their position that the purpose

of the Church's Helpline is "to assist [Church] bishops and stake presidents in ministering

to victims and affected families in abuse situations, and to ensure that they comply with all

applicable reporting laws." Although the defendants champion the exclusion of this form

at trial as being irrelevant and unauthenticated,[58] they also claim it reflects the Church's

vigorous policy of protecting and helping abuse victims. Conversely, the plaintiffs contend

they can authenticate this form, which is relevant and supportive of their conspiracy claim.

---

[57](...continued)
from legal counsel; that the form contains various topics to discuss and handle when a call comes into the Helpline; and that once a particular situation is resolved, the form would be destroyed. For unknown reasons, this particular document was among the documents returned by the Church to Unnamed Witness-1.

[58]In the plaintiffs' opposition to the motion in limine filed below, they stated that the defendants have refused to produce Mr. Gundry for deposition, representing that he could not recall the particular Helpline call from Unnamed Witness-1, and that their motion to compel his deposition had not been ruled upon by the discovery commissioner.

This alleged Helpline form warns that Helpline "PERSONNEL SHOULD NEVER ADVISE A PRIESTHOOD LEADER TO REPORT ABUSE. COUNSEL OF THIS NATURE SHOULD COME ONLY FROM LEGAL COUNSEL[.]"  The plaintiffs argue their intent is not to show that this form was used when Bishop Vincent telephoned the Helpline in 2012, but to support their claim of institutional concealment[59] and their position that the Helpline was implemented to protect the Church from civil liability rather than simply to protect victims from sexual abuse.  They add the form is indicative of a "general strategy in responding to assertions of sexual abuse in the Mormon community," which is as true today as it was when the Helpline was first implemented in the 1990s.  The Church defendants refute this assertion, arguing that any notion that its Helpline procedure has not changed since 1995 is "flatly contradicted by the record" and that "[w]itnesses familiar with the Helpline procedure testified that no such form is used today; [and that] they have no knowledge of the purported Helpline form or any written protocol."

While this particular evidence, as well as other evidence in the appendix record, would support the inference urged by the plaintiffs, it also arguably supports the Church defendants' position that this form is indicative of the Church's purported laudatory policy and goal of preventing and protecting abuse victims.  Although the defendants contend this form document has no bearing on the plaintiffs' conspiracy claim, we find a jury could

---

[59]It appears that the Church's documents related to a call to the Helpline are destroyed after the call is resolved.

reasonably infer that the defendants' silence in the face of repeated reports of alleged abuse by Michael Jensen, while simultaneously holding him out as a suitable babysitter and boarder to Church families, was consistent with this form document's warning to "never advise a priesthood leader to report abuse." Accordingly, we find this document to be relevant and probative of the plaintiffs' conspiracy claim. With that said, this Court does not know by what means the plaintiffs will seek to admit this evidence at trial. In other words, the circuit court must determine at trial whether the plaintiffs can authenticate the document, as they aver they can, and whether they can overcome the defendants' evidentiary objections in that regard.

### 6. Church's Annotation System

In essentially two sentences, the circuit court excluded evidence relating to the Church's annotation system, finding that "using an internal recordkeeping mechanism . . . against the Church . . . would create First Amendment concerns," without offering any further explanation or analysis as to what that concern might be. The annotation system is part of the Church's abuse "prevention and response" procedure for annotating records of members who commit child abuse or might otherwise pose a threat. The circuit court concluded that because the Church did not use its annotation system to annotate Michael Jensen's Church membership record, any probative value was substantially outweighed by "the potential for confusing the issues, undue delay, and wasting time." The plaintiffs assert

the circuit court erred in this regard, notwithstanding its further ruling that the Church defendants could not use the annotation system in their defense.

The plaintiffs argue the Church has "touted its abuse response and prevention procedures as the gold standard," which in the opinion of the Church defendants' expert, exceeds the secular standard of care for youth-serving institutions. A part of these procedures is the Church's Helpline, as discussed above, as well as its annotation system. The plaintiffs planned to offer evidence at trial that Bishop Swenson did not annotate Michael Jensen's Church membership record following his admission to sex offenses in Utah and, had he done so, Church leaders in West Virginia would have received earlier notice of Michael's sex offenses, which could possibly have prevented the abuse of the minor plaintiffs through the Church's secular duty to warn. Arguing further, the plaintiffs state this evidence is relevant and is not a "waste of time" when they have alleged the Church's failure to warn is part of the alleged conspiracy. Rather than substantively challenging the Church's failure to annotate Michael's record following his Utah offenses as a matter of Church doctrine, the plaintiffs assert their intent to simply show that the Church did not use its system to warn and protect.[60] Although the defendants argue the annotation system is

---

[60]Other than a vague reference to "First Amendment concerns[,]" the circuit court's December 30, 2015, in limine order contains no analysis of this particular concern. The defendants argue that allowing a jury to assess whether the Church's annotation system was properly applied to Michael "would necessarily involve excessive entanglement by the government with the Church in violation of the Establishment Clause." *Turner v. Church*
(continued...)

irrelevant to Michael Jensen because it only restricts the types of church callings a congregant can have, and Michael's abusive conduct was "out-of-church" conduct, the plaintiffs counter that Church leaders placed him as a babysitter in several homes,[61] as a boarder in others, and as an unsupervised substitute teacher in the Church's primary class of four-year-old children.

Regarding the defendants' argument that their evidence demonstrates that only adult records are annotated, the plaintiffs point to contrary evidence in the appendix record. In response to the defendant's assertion that annotating Michael's record would have made

---

[60](...continued)
*of Jesus Christ of Latter-day Saints*, 18 S.W.3d 877, 897 (Tex. Ct. App. 2000). The defendants also rely upon *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969), wherein the Court cautioned against civil courts "engag[ing] in the forbidden process of interpreting and weighting church doctrine." *Id.* at 451. Conversely, the plaintiffs assert they do not challenge substantively the Church's failure to annotate Michael Jensen's record following the Utah offenses "as a matter of Church doctrine." They cite *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 431 (2d Cir. 1999), for the proposition that a church's actions are "facts" that can be considered if a party does not challenge that action as "true or false." Here, the plaintiffs plan to show, "as a matter of fact," that the Church had a system to warn and protect, thereby making it feasible to warn and protect, but failed to use that system. We do not see this purpose as raising a First Amendment concern. If the plaintiffs veer from their stated purpose for this evidence at trial such that a constitutional concern arises, the circuit court can address any such concern at that time.

[61]The plaintiffs are referring to the babysitting arrangements that Sandralee Jensen made for Michael in her leadership position as the Church's Relief Society President and later offering Michael as a babysitter for the Doe-3 children so that Jane and John Doe-3 could attend her scout training meeting when she had oversight of the Church's Cub Scout program.

no difference because it would only have been seen by his bishop and Stake president, the plaintiffs point to the Church's Rule 30(b)(7) witness who testified that the purpose of notifying the bishop and Stake president is so that they can, in theory, take steps to protect potential victims.

We find the circuit court abused its discretion in excluding evidence of the existence of a system that the defendants have described as meeting, if not exceeding, the Church's secular duty as a youth-serving organization. This evidence is not only relevant and probative of the Church defendants' defense, it is equally relevant and probative to the plaintiffs' claims, particularly when notice and the Church's failure to warn is part of the conspiracy claim. Any factual disputes presented by the evidence at trial may be resolved by a jury. Accordingly, we conclude that the probative value of this evidence is not outweighed by any potential for issue confusion the issues, undue delay, and wasting time, and it was error for the circuit court to have excluded this evidence.

### C. Partial Summary Judgment in Favor of Church Defendants and the Jensen Parents on Conspiracy Claim

In its order entered on December 31, 2015, the circuit court awarded partial summary judgment in favor of these defendants pursuant to Rule 56 of the West Virginia Rules of Civil Procedure. Under this rule, a party is entitled to summary judgment if it can show "that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." *Id.*, in part. Specifically, the circuit court granted summary judgment on the plaintiffs' conspiracy claim after observing that it had "eliminated much of the circumstantial evidence that Plaintiffs intended to use in support of their conspiracy claim[,]" and that the plaintiffs had no direct evidence of a conspiracy. In its rather cursory five-page order, the circuit court found that the plaintiffs' conspiracy claim was based on speculation, conjecture, cumulative inferences, and was so implausible that no reasonable juror could conclude that local Church leaders in two different states conspired with Michael Jensen and his parents over a number of years to conceal his abuse, or to "actively facilitate his pedophilia by trumpeting his moral worthiness to the congregation and obstructing a criminal investigation." The circuit court concluded it was "insufficient for Plaintiffs to show that multiple people happened to do the same thing, or refrained from doing the same thing, particularly when they all deny knowing that Michael Jensen was an abuser, and when the Church condemns child sexual abuse."

In seeking a reversal of the circuit court's ruling, the plaintiffs assert the lower court engaged in impermissible fact-finding by weighing conflicting evidence, resolving credibility disputes, dismissing and resolving doubts and drawing inferences in favor of defendants, when those inferences should have been drawn in their favor, as the nonmoving party. Arguing further, the plaintiffs assert that the lower court substituted its judgment for that of a jury on the weight, existence, and sufficiency of plaintiffs' evidence through its in

54

limine rulings. Maintaining that whether there was sufficient evidence for trial should have been evaluated under the procedural requirements and guidelines for deciding a Rule 56 motion–not as a motion in limine–the plaintiffs state that their conspiracy claim is based on intentional acts and intentional torts and that the defendants conspired with Michael Jensen to:

> promote and create opportunities for Michael Jensen to babysit and live in homes with small children; cover up incidents of sexual abuse of minors by Michael Jensen; prevent disclosure of Michael Jensen's sexual abuse of young children; thwart and/or hinder enforcement actions by civil and criminal authorities to prevent further abuse and protect minor children; and to engage in the other conduct alleged herein. Based on these actions, the Defendants conspired for the unlawful purpose of facilitating Michael Jensen's criminal and tortious acts against the minor Plaintiffs, and for the further unlawful purpose of concealing and suppressing information on the danger and threat that Michael Jensen posed to unsuspecting children.

The plaintiffs assert that when a conspiracy produces a tort, "'every conspirator is liable for that tort, including a conspirator who promoted but did not commit the tort[.]'" *Dunn*, 225 W.Va. at 57, 689 S.E.2d at 269 (citations omitted). They further argue that "once the conspiracy is formed, all of its members are liable for injuries caused by any unlawful acts performed pursuant to and in furtherance of the conspiracy." *Id.* Although a principal cannot conspire with its agent,[62] the plaintiffs assert "a corporation can act only through its

---

[62]*Cook v. Heck's Inc.*, 176 W.Va. 368, 375, 342 S.E.2d 453, 460 (1986) ("'Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their
(continued...)

agents or employees"; therefore, when the Jensen parents "were not acting as Church agents . . . they were members of the conspiracy in their own right, and . . . could conspire with the Church[,]" and when they were "acting as agents of the Church, then their acts were on behalf of the Church and [the Church's] participation in the conspiracy."[63] The plaintiffs add that even if the Jensens are considered to have been agents of the Church *at all times*, which no one claims, a civil conspiracy requires only two members, and Michael Jensen was always a member of the conspiracy. *Dunn*, 225 W.Va. at 56, 689 S.E.2d at 268 ("[A] civil conspiracy is a combination of two or more persons[.]") (citation omitted).

Discounting the plaintiffs' arguments, the defendants contend that the plaintiffs have built their conspiracy claim on "layers of unreasonable inferences[,]" which are so implausible that no reasonable jury could conclude otherwise. They maintain there is no evidence from which a jury could reasonably infer a preconceived common agreement to cover up or minimize any abuse or identify any concerted action in furtherance of a conspiracy. Arguing further, they state that, "[a]t worst, there were unrelated incidents of ordinary negligence by individual actors" which, if proven, would allow the plaintiffs to recover on their remaining negligence and fraud claims. The Church defendants insist, with

---

[62](...continued) individual advantage.'") (citations omitted).

[63]*Heck's Inc.*, 176 W.Va. at 375, 342 S.E.2d at 460 (commenting that corporation "can act only through its agents or employees").

56

the possibility of a single exception,[64] they were not involved with the babysitting and living arrangements that resulted in the abuse. They contend the plaintiffs' theory that the conspirators "facilitated" and "created opportunities" for Michael to have access to children that he could then sexually abuse[65] lacks any evidentiary support and is "utterly unreasonable and unbelievable on its face."

In addition to echoing many of the Church defendants' arguments, the Jensen parents add that there was no conspiracy of silence because their alleged co-conspirators had no reason to believe Michael had sexually abused any children, and they were unaware of Michael's babysitting activities. They further argue that R.J. was never abused by anyone; that Bishop Whitcomb assigned Sandralee Jensen as the Relief Society President and advanced Michael in the Church's Aaronic Priesthood at a time when he had no knowledge of Michael's offenses in Utah; and that even if the alleged 2006-2007 Stake High Council meeting occurred, such event does not prove they were part of a conspiracy. In addition, they assert there is no evidence that the alleged co-conspirators were aware of any sexual abuse

---

[64]Presumably, the defendants are referring to Bishop Vincent approaching a Church family, the Keogans, about taking Michael Jensen into their home to live and asking Mrs. Keogan if there were any "young women" in her house. Bishop Vincent's inquiry was made after he learned that Michael had been banished from his family's home for abusing his then twelve-year-old sister, K.J.

[65]Contrary to the defendants, we view the plaintiffs' theory as alleging that the defendants' actions to conceal Michael's abuse while simultaneously holding him out as a fit babysitter and boarder resulted in unsuspecting Church families allowing him to do both.

committed by Michael, except the possible abuse of Z.W. that was allegedly disclosed to them and to Bishop Fishel in 2008. They add that there is no evidence of a conspiracy of silence related to Michael's abuse of his younger sister, K.J., when they "immediately kick[ed] Michael out of the house, which would have raised questions,"[66] and given that they also spoke to Bishop Vincent about the incident, asking him to help Michael. The Jensens state that, at worst, the evidence shows that different people conceivably knew "bits and pieces of alleged misconduct by Michael, but there is no evidence of some grand scheme to conceal this misconduct—no evidence of any agreement to cover up, not to report, or to prevent disclosure."

It is axiomatic that "[s]ummary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party[.]" Syl. Pt. 2, in part, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995). Further, as we held long ago, "summary judgment . . . must be denied if there is a genuine issue as to a material fact[,]" and that "[t]he question to be decided on a motion for summary judgment is whether there is a genuine issue of fact and not how that issue should be determined." Syl. Pt. 4, in part, Syl. Pt. 5, *Aetna Cas. & Sur. Co. v. Fed. Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

---

[66]The Jensens impute knowledge to their church leaders and church family for certain things, such as kicking Michael out of their home, but not for other things, such as R.J. disrobing and exposing her body at a church function.

58

We previously articulated guidelines for evaluating a motion for summary judgment, as follows:

> The circuit court's function at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Consequently, we must draw any permissible inference from the underlying facts in the most favorable light to the party opposing the motion. In assessing the factual record, we must grant the nonmoving party the benefit of inferences, as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"

*Williams*, 194 W.Va. at 59, 459 S.E.2d at 336 (internal citations omitted). Applying these guidelines and precepts to a review of the circumstantial evidence previously excluded by the circuit court, as well as all other evidence, readily demonstrates the existence of a myriad of genuine issues of material fact that should have precluded entry of summary judgment. Indeed, other than the parties' identities and Michael Jensen's convictions in West Virginia, there appear to be very few facts upon which the parties agree. Nearly every factual allegation is contested in some fashion, whether by inconsistencies between interviews, depositions, and affidavits, often from the same individuals, or interpretations of the evidence, or the inferences to be drawn from that evidence.

For instance, the plaintiffs contend the conspiracy to protect Michael Jensen and to conceal his offenses began after he was charged with felony sex offenses in Provo, Utah, as a teenager. They discuss various facts in support of their theory, including the

59

involvement in that proceeding by Michael's paternal grandfather, who held a powerful position within the Church in Provo. They also cite the testimony of defense expert Frank Yannelli who testified that the charges against Michael in Utah were reduced more than commonly done; that there were numerous other atypical factors in the proceeding;[67] and that Michael received a lenient punishment without follow up consequences. Conversely, the defendants point to Mr. Yannelli's April 3, 2015, witness statement in which he stated that the outcome of Michael's case in Utah "was typical for such a case."[68]

Another disputed issue of material fact involves the parties' basic disagreement regarding the precise nature of Michael's offenses in Utah and whether they provided notice of his risk to re-offend sexually. The plaintiffs describe Michael's offenses, which resulted in his arrest at his middle school and being charged with two felony sex offenses, as him waiting for each victim, pinning her against a wall, and grabbing her breasts and buttocks against her will, a description that is consistent with victim statements in the appendix record. Conversely, the defendants describe the incident as Michael briefly groping two peer-aged

---

[67]During his deposition, Mr. Yannelli testified there was a departure from the SBRA recommendation that Michael receive more substantive sex offender treatment; the SBRA's recommendation that he be supervised with any female was ignored; and there was no order entered prohibiting contact with the victims.

[68]Although Mr. Yannelli indicated in his witness statement that the reduction in the two felony charges to class A misdemeanors "would be considered a significant reduction of the charges, but one that was clearly justified by the facts of the case[,]" he testified during his deposition that other prosecutors might disagree.

60

girls over their clothes, which the Jensen parents contend were "offenses that were not atypical for a male of his age."[69]

Additional disputed facts in the alleged conspiracy time line include Sandralee Jensen's report of the J.M. incident to Bishop Whitcomb, whether there was a "linkup" in her mind between that incident and Michael's offenses in Utah and whether she conveyed the same to Bishop Whitcomb, and the concern she expressed to J.M. asking if she was all right and whether they had a problem. Michael's alleged assault of J.M. is described above and will not be repeated here. It will be for a jury to make credibility determinations in this regard.

There are also disputed issues of material fact concerning the alleged Stake High Council meeting during which the plaintiffs contend that Church leaders discussed the issue of sexual abuse and the Jensens in the 2006-2007 time frame. The defendants assert that all those who would have participated in such a meeting have denied it ever occurred; that UD-1 could not have participated because he was not placed on the Stake High Council until 2008; that John Doe-5's testimony that Stake President Grow told him that such a meeting took place is self-serving hearsay; and that no such discussion could have happened because no Church leader learned of Michael's abuse until after his arrest in 2012. The

_____

[69]Given the victims' accounts of what happened, this pronouncement by the Jensens and the defendants' description of the Utah offenses as "briefly groping" are troubling.

plaintiffs counter that John Doe-5 testified during his deposition that Stake President Grow confirmed to him such discussions about the Jensens had taken place in the time frame in question and that he had asked UD-1 to keep an eye on Chris Jensen and report back to him; and that President Grow's executive secretary also confirmed that these Stake discussions concerning the Jensens took place. The plaintiffs also point to UD-1's interview by their counsel during which he stated, "I was on councils," referring to Stake High Councils, where the issue of sexual abuse by Michael was discussed during the relevant time frame, as contrasted with the conflicting statements made by UD-1 during his subsequent deposition. They also point to the depositions of those adult plaintiffs who testified to having similar disclosures made to them by UD-1.

These and many other genuine issues of material fact arise out of the plaintiffs' circumstantial evidence. Although the circuit court stated the plaintiffs' have no direct evidence, none is required to prove their conspiracy claim. As we previously explained:

> "Circumstantial evidence is information that tends directly to prove or disprove not a fact in issue but a fact or circumstance from which, either alone or in connection with other facts and circumstances, one may, according to the common experience of mankind, reasonably infer the existence or nonexistence of a fact that is in issue. . . . In West Virginia and in federal courts, civil and criminal verdicts may be based entirely upon circumstantial evidence."

*Cmty. Antenna Serv., Inc. v. Charter Commc'ns VI, LLC*, 227 W.Va. 595, 607, 712 S.E.2d 504, 516 (2011) (citation omitted). Further, "[c]ircumstantial evidence, especially evidence

of concerted activity directed toward achievement of a common goal, is as probative as direct evidence" of conspiracy. *United States v. Amer. Grain*, 763 F.2d 312, 315 (8th Cir. 1985); *see also Xie v. City of Chicago*, No. 14-cv-6082, 2016 WL 6193981, at \*10  (N.D. Ill. Oct. 24, 2016) ("[D]irect proof of such an agreement is rarely available, since conspiracies are by their very nature secretive; thus, the existence of a conspiracy may be inferred through the combination of common sense and circumstantial evidence."); *Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 319-20 (S.D. N.Y. 2009), *aff'd Maersk, Inc. v. Sahni*, 450 Fed.Appx. 3 (2d Cir. 2011) (citation omitted) ("As is true in criminal conspiracies, agreements in civil conspiracies will not easily be shown by direct evidence, but may be inferred from circumstantial evidence."); *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 895 (Ill. 1994) ("[A] conspiracy is rarely susceptible of direct proof; instead, it is established from circumstantial evidence and inferences drawn from evidence, coupled with commonsense knowledge of the behavior of persons in similar circumstances."); *Brown v. Cameron-Brown Co.*, No. 78-0836-A, 1980 WL 1856, at \*6 (E.D. Va. June 13, 1980), *rev'd on other grounds*, 652 F.2d 375 (1981) (internal citations omitted) ("[C]ourts long have held that conspiracies may be inferred from circumstantial evidence. . . . No formal or express agreement need be shown."); *Dickerson v. Gynecological Assoc.'s, Inc.*, No. 32143-9-I, 1996 WL 751461, at \*4 (Wash. Ct. App. Oct. 21, 1996) (agreeing with defendant that "circumstantial evidence is as probative as direct evidence and that conspiracy can rarely be proved by direct evidence").

Inasmuch as a conspiracy may be proven by circumstantial evidence, we consider the evidence the plaintiffs have offered, including the circumstantial evidence that had been excluded by the circuit court. In undertaking that task, we are mindful that under West Virginia law,

> [a] civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff.

*Dunn*, 225 W.Va. at 47, 689 S.E.2d at 259, syl. pt. 8. Further, "[a] civil conspiracy is . . . a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." *Dunn*, 225 W.Va. at 47, 689 S.E.2d at 259, syl. pt. 9; *see also O'Dell v. Stegall*, 226 W.Va. 590, 625, 703 S.E.2d 561, 596 (2010) ("[A] civil conspiracy must be based on some underlying tort or wrong."). Moreover, "[a] conspiracy may produce one or more torts. If it does, then every conspirator is liable for that tort, including a conspirator who promoted but did not commit the tort." *Dunn*, 225 W.Va. at 57, 689 S.E.2d at 269 (quoting *Segall v. Hurwitz*, 339 N.W.2d 333, 338 (Wis. Ct. App. 1983) (citations omitted).). Further, we recognize that not every member of a conspiracy must be aware of every action taken in furtherance of it. *See*, *e.g.*, *Potter Press v. C.W. Potter, Inc.*, 22 N.E.2d 68, 72 (Mass. 1939) ("One may be held a member of a[] . . . conspiracy and responsible for all its doings, although he was not aware of its entire scope, or all its details, or the identities, of

all its members, and although his own share in its activities was small, did not begin until its activities were well under way[.]"); *Lesikar v. Rappeport*, 33 S.W.3d 282, 302 (Tx. Ct. App. 2000) ("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that . . . acts were committed in furtherance of . . . [the] purpose of the alleged conspirators *** . . . . It is not required that each and every act of a conspirator be shown to have been in concert with the others or that it be established by direct evidence that all combined at a given time prior to each transaction.") (citations omitted)).

Although the defendants assert the conspiracy claim fails because failure to warn is negligence, and persons cannot conspire to be negligent, the plaintiffs have alleged a conspiracy to commit intentional torts[70] and to accomplish the unlawful purpose of concealing and harboring a "sex offender"[71] that resulted in harm to them. A jury, after sifting through the evidence, resolving credibility disputes, and drawing all reasonable inferences from the evidence, could conclude, as the plaintiffs argue, that the defendants' conduct

---

[70]In their amended complaint, the plaintiffs have alleged the intentional torts of fraud and intentional infliction of emotional distress; they also allege the intentional torts of assault and battery solely against Michael Jensen.

[71]The Jensen parents object to the plaintiffs' reference to their son Michael as a "sex offender," arguing that Michael's crimes in Utah did not qualify him as a sex offender under Utah law because he was adjudicated as a juvenile.

65

in ignoring, minimizing, trivializing and denying the abuse; actively concealing and keeping silent about the abuse; promoting and misrepresenting Michael Jensen as an exemplary and trustworthy member of the Church; promoting and misrepresenting him as fit to babysit for or live in a house with young children; and facilitating the abuse by engaging in the foregoing and placing him in homes with young children as a babysitter or boarder, were taken in furtherance of the conspiracy's unlawful purposes.

Moreover, as the plaintiffs contend, "even if some of those acts, taken independent of the conspiracy, would be lawful," a jury could still find that the conspiracy was proven. *See* Syl. Pt. 1, in part, *Dixon v. Am. Indus. Leasing Co.*, 162 W.Va. 832, 253 S.E.2d 150 (1979) ("In order for civil conspiracy to be actionable it must be proved that the defendants have committed some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff[.]").

Regarding the defendants' argument that an agent cannot conspire with his or her principal,[72] even if the Jensen parents were found to have been agents of the Church at all times, the conspiracy claim is not defeated because a civil conspiracy requires only two members. Michael Jensen is alleged to have always been a member of the conspiracy.

The evidence discussed above serves to highlight but a few of the innumerable issues of material fact in this matter and the conflicting inferences being drawn by all parties

---

[72]*See supra* notes 62 and 63.

from those disputed facts. It will be for a jury, not the circuit court or this Court, to decide whether there was a conspiracy after resolving the disputed facts, making the necessary credibility determinations, and determining what was known by whom and when, and what those persons did with the information they had and for what purposes. It will also be for a jury to determine whether the evidence proves a conspiracy that resulted in harm to the plaintiffs.

Skirting its duty to allow a jury to address the multitude of disputed factual issues present in this case, the circuit court wrongly invade the jury's province by resolving these factual disputes and making credibility determinations. And when it credited the defendants' denials or their alternative facts in the face of countervailing evidence, the circuit court violated the long-established standard of resolving doubts in favor of the nonmoving party. Despite the defendants' assertion that the plaintiffs' "far-fetched conspiracy theory is utterly implausible" and that "[n]o reasonable jury would draw the outlandish inferences necessary to find in Plaintiffs' favor[,]" the plaintiffs have aptly argued:

> Neither the circuit court's presumption of good faith by a religious institution based on its public pronouncements, nor its dismissal of an eight year record of contrary conduct as multiple Church officials just happening to do the same thing with respect to Michael Jensen, should have supplanted the jury's consideration of the evidence, which was more than sufficient to support an inference of conspiracy.

67

This appeal is not about whether the plaintiffs will prevail on their conspiracy claim at trial but whether they have alleged sufficient evidence to survive summary judgment on that claim. We agree that they "'"cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."'" *Dellinger v. Pediatrix Med. Group, P.C.*, 232 W.Va. 115, 122, 750 S.E.2d 668, 675 (2013) (citations omitted). Although the circuit court found the plaintiffs' evidence to be speculative, and the defendants contend the plaintiffs' evidence is nothing more than unreasonable, cumulative inferences, the necessary basis for granting summary judgment is clearly not present in this case.

Having found the circuit court erred in excluding the plaintiffs' circumstantial evidence in support of their conspiracy claim, and upon our consideration of that evidence, as well as all other evidence relied upon, we find there are genuine issues of material fact for trial. Drawing all permissible inferences from the facts in the light most favorable to the plaintiffs and leaving all factual disputes and credibility determinations to the jury, we conclude that the circuit court erred. Accordingly, we reverse the circuit court's order granting summary judgment in favor of the Church defendants and the Jensen parents on the plaintiffs' conspiracy claim.

## D. Summary Judgment in favor of UD-1

Through its order entered on December 4, 2015, the circuit court granted summary judgment in favor of UD-1, finding the plaintiffs could not prove the elements of conspiracy against him. For the reasons set forth below, we disagree.

The circuit court determined that to the extent UD-1 was an agent of the Church, he could not conspire with his principal;[73] that plaintiffs had not produced any evidence that would create a genuine issue of material fact as to whether UD-1 joined a conspiracy to facilitate or conceal Michael Jensen's abuse of children; that even if UD-1 had knowledge of Michael's abuse of children and failed to disclose it, he had no duty to warn;[74] that there is no evidence his silence enabled or assisted someone who had such a duty; that UD-1's attendance at the victims' parents' support meeting in 2013 was not evidence of furthering the alleged conspiracy where John Doe-5 invited UD-1 to that meeting and knew UD-1 would be reporting on the meeting to Stake President Grow; and that even if UD-1

---

[73]*See supra* note 62.

[74]The circuit court cited in its summary judgment order West Virginia Code § 49-2-803(a), which imposes a duty on certain persons to report the suspected abuse of a child. The circuit court found that the duty only extends to the child who is suspected of being abused; therefore, even if UD-1 had a duty to report based on knowledge he purportedly gained at the alleged 2006-2007 Stake High Council meeting, it would only extend to children discussed at that meeting, which were indisputably not the minor plaintiffs. However, regardless of whether UD-1 had a statutory duty to report, including the purported abuse of his own son, if a jury resolves the factual disputes and draws reasonable inferences in favor of the plaintiffs, it could find that UD-1's action and inaction demonstrated his participation in a conspiracy by furthering the unlawful purposes of those who did have a duty to report.

made statements during his deposition that contradicted statements he had previously made when interviewed by plaintiffs' counsel, Michael's crimes were already known at that juncture; therefore, UD-1's actions could not have been taken to keep Michael's misconduct a secret. The plaintiffs assert that in making these findings, the circuit court clearly engaged in impermissible fact-finding to conclude as a matter of law that no reasonable juror could infer from UD-1's conduct that he had agreed with other Church officials to conceal Michael Jensen's conduct, which facilitated harm to the minor plaintiffs.[75]

In support of their argument that UD-1was a participant in the alleged conspiracy beginning in 2006-2007, they contend that their evidence shows his knowledge of Stake discussions around that time regarding Michael's abuse of a younger sibling and possibly another girl; UD-1's monitoring of Chris Jensen during that same time period at Stake President Grow's request, including making reports back to President Grow; his "inside knowledge" of Michael's Utah offenses; and his decision not to seek medical care for his two-year-old son who came home from childcare conducted in the Jensen home in

---

[75]In their Amended Complaint, the plaintiffs alleged alternative theories of conspiracy liability. First, they alleged that UD-1 had a special relationship with the Church's congregation, as a volunteer or a Stake High Councilor appointed by Church officials and was "held out by the Church as its agent[] and placed in [a] position[] of responsibility and authority over Church members." In the alternative, they alleged that if UD-1 was not an agent of the Church, then the other defendants conspired with him for the same unlawful purposes they had alleged. It will be for a jury to resolve the facts in terms of what UD-1 knew and when and whether at those times he was acting individually or as an agent of the Church. We previously addressed the issue of whether a corporation can conspire with its employees or agents. *See supra* note 62.

70

2008 with a swollen penis and abrasions on his inner thighs when it was physically impossible for his child to have self-inflicted the injuries.[76] The plaintiffs also point to UD-1's placement on the Stake High Council in 2008; his email to John Doe-5 in 2013 reflecting that he and his wife believed in 2008 that Michael had abused their son and had confronted the Jensen parents, but "nothing was done"; his attendance at the parent support group meeting in 2013, and his report on that meeting to Stake President Grow; his forwarding of private emails he exchanged with John Doe-5 concerning the abuse and this lawsuit to Stake President Grow; and the change in his accounts of these various events[77] to align himself with the Church's defense.

Notwithstanding the factual allegations recounted above, UD-1 argues that the circuit court correctly found that the plaintiffs' conspiracy claim against him fails, as a matter of law, because there is no genuine issue of fact relating to whether he entered into a conspiratorial agreement, whether there was concerted action, or whether he committed an

---

[76]Although UD-1 and his wife have testified that their decision not to seek medical care for their son was not motivated by any concern there would be a mandatory report to State authorities, UD-1's wife, who was a nurse, testified in her deposition that if a child presented to the hospital with her son's injuries, she would have been obligated to report it. *See also supra* note 21.

[77]This is in reference to statements made by UD-1, when interviewed by plaintiffs' counsel and during conversations he allegedly had with certain of the plaintiffs, as contrasted with his subsequent, contradictory deposition testimony.

unlawful act or pursued an unlawful purpose.[78]  He further argues that even if he took all of the actions outlined above, none were either unlawful or done for an unlawful purpose.  He further argues that failure to warn is not unlawful unless he had a duty to warn, and he had no such duty.[79]

We first address the circuit court's finding, and UD-1's argument, that because he did not owe a duty to plaintiffs to warn, therefore, he could not be found liable for conspiracy.  Critically, neither UD-1 nor the circuit court have cited any authority for the proposition that UD-1 had to owe an independent duty to the plaintiffs before he could be found liable for conspiracy, which is the only claim that has been asserted against him.  While this Court has said that "the proponent of a civil conspiracy claim must produce at least circumstantial evidence that each member of the alleged conspiracy shared the same

[78]UD-1 also asserts that plaintiffs have failed to identify damages proximately caused by or distinctively arising from the conspiracy since the damages sought for the conspiracy are the same damages sought on their remaining causes of action.  This issue was addressed in section II.A, *supra*.

[79]The circuit court found that UD-1's failure to report the purported sexual abuse of his own son when he was cared for at the Jensen home does not support a finding that he participated in a conspiracy unless he personally had a duty to disclose or assisted another having such a duty.  Setting aside whether a person has a duty to report the sexual abuse of his or her child, it will be for a jury to determine when UD-1 came to believe that his son had been abused, and whether that knowledge contributed to a conspiracy with Church officials and the Jensens that harmed the plaintiffs.  The plaintiffs have circumstantial evidence that could cause a reasonable jury to conclude that UD-1 immediately believed his son had been abused by Michael.

72

conspiratorial objective and mutual agreement[,]"[80] we have not said that each member of a conspiracy must independently owe a duty to the plaintiff.[81]

As we have explained, "every conspirator is liable for th[e] tort, including a conspirator who promoted but did not commit the tort." *Dunn*, 225 W.Va. at 57, 689 S.E.2d

---

[80]*Ash v. Allstate Ins. Co.*, No. 12-1533, 2013 WL 5676774, at *5 (W.Va. Oct. 18, 2013) (memorandum decision).

[81]Our research reveals a split of authority in those few courts that have addressed that question. *See*, *e.g.*, *Boorman v. Nevada Mem. Cremation Soc'y, Inc.*, 772 F. Supp. 2d 1309, 1315 (D. Nev. 2011) (applying Nevada law; observing that "Nevada has not stated that it would require each conspirator to owe the duty that forms the predicate for the underlying tort"; and concluding that "Nevada does not require that each conspirator owe an independent duty to the plaintiff to support a civil conspiracy claim."); *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 150 (Del. 1987) (agreeing with, but finding irrelevant, defendant's argument that it had no duty to warn customers because liability attaches "as a result of the *active* misconduct of intentionally suppressing material information" and finding that if plaintiffs "establish that Nicolet was a member of a conspiracy which actively suppressed and concealed material facts . . . Nicolet would be jointly and severally liable with its co-conspirators for resulting damages."); *but see*, *e.g.*, *Chavers v. Gatke Corp.*, 132 Cal.Rptr.2d 198, 201 (Cal. Ct. App. 2003) (citing *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454 (Cal. 1994) (observing that under California law, "before one can be held liable for civil conspiracy, he must be capable of being *individually liable for the underlying wrong as a matter of substantive tort law*. And that requirement, of course, means he must have owed a legal duty of care to the plaintiff, one that was breached to the latter's injury."); *Valles v. Silverman*, 84 P.3d 1056, 1064, 1065 (N.M. Ct. App. 2003) (rejecting Wal-Mart's argument that plaintiffs "must be able to recover on the underlying tort against *every* coconspirator before that coconspirator can be liable for its part in the conspiracy" but also finding that Wal-Mart must be "legally capable" of committing malicious abuse of process to be held liable as a coconspirator."). As one commentator has observed: "The acts of any one co-conspirator are deemed the acts of all" and "[n]either a co-conspirator's culpability nor the increased risk of harm caused by his or her entering into a combination is related to whether the co-conspirator owes the underlying duty." Martin H. Pritikin, *Toward Coherence in Civil Conspiracy Law: A Proposal to Abolish the Agent's Immunity Rule*, 84 Neb. L. Rev. 1, at **9, 13 (2005).

at 269 (citations omitted).  Further, there were times during the course of the alleged conspiracy when UD-1 served on the Church's Stake High Council.  In that leadership role, he may have possessed a duty to other Church members, including the plaintiff families, which the circuit court also did not address.  In addition, we disagree with the circuit court's finding that the plaintiffs have no evidence that UD-1 enabled or assisted someone who did have a such duty.  A jury could reasonably infer from the plaintiffs' circumstantial evidence, some of which is outlined above, that UD-1 did enable and assist those who had such a duty.  It will be for a jury to resolve all evidentiary disputes and make credibility determinations in this regard.

Moreover, one can conspire "to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means."  *Dunn*, 225 W.Va. at 47, 689 S.E.2d at 259, syl. pt. 8, in part.  Contrary to UD-1's argument, this does not imply that each member of the conspiracy must engage in unlawful acts.[82]  *See Kessel v. Leavitt*, 204 W.Va. at 129, 511 S.E.2d at 754 (citations omitted) (finding civil conspiracy "actionable . . . [if it] be proved that the defendants have committed some wrongful act or have

---

[82]UD-1 cites syllabus point two of *Porter v. Mack*, 50 W.Va. 581, 40 S.E. 459 (1901), holding that "[t]here can be no conspiracy to do that which is lawful in a lawful manner." Here, however, the plaintiffs have alleged unlawful purposes as the object of the alleged conspiracy, including protecting Michael Jensen, who was known to have committed sexual offenses, and promoting Michael's exposure to children he then assaulted.  They have also offered evidence, albeit contested, that the conspiracy produced intentional torts and intentional acts in furtherance of the conspiracy's unlawful purposes.

committed a lawful act in an unlawful manner to the injury of the plaintiff[.]"); *see also* 15A

C.J.S. *Conspiracy* § 5 (2012) (footnotes omitted) ("When the purpose of a combination is

illegal, every act in furtherance of it is illegal. Acts that are themselves legal lose that

character when they become constituent elements of an unlawful scheme.").


As with the other defendants, the circuit court faults the plaintiffs for not

having any direct evidence that UD-1 agreed to join the conspiracy or possessed personal

knowledge of a conspiracy. The circuit court found the plaintiffs' circumstantial evidence

of UD-1's participation in the alleged conspiracy to be "too conjectural and speculative to

raise an issue of fact." However, much of the plaintiffs' evidence came directly from UD-1,

as recounted in the deposition testimony of several plaintiffs and as reflected in UD-1's email

exchanges with certain plaintiffs and the statements he made when interviewed by plaintiffs'

counsel.[83] In addition to the circuit court's credibility determinations being improper, an

"agreement need not be express but may be based upon evidence of a course of conduct from

which the agreement to act in concert may be implied." 16 Am.Jur.2d *Conspiracy* § 51

(2017) (footnotes omitted); *see also First Fin. Sav. Bank, Inc. v. Am. Bankers of Florida,*

*Inc.*, Nos. 88-33-CIV-5-H, *et al.*, 1990 WL 302790, at *2 ( E.D. N.C. Apr. 17, 1990) ("The

---

[83]Evidence concerning the alleged 2006-2007 Stake High Council meeting and President Grow's assignment of UD-1 to monitor Chris Jensen was not only from UD-1. John Doe-5 testified that Stake President Grow told him (1) about conversations at the stake level in 2006 or 2007 concerning abuse and the Jensens and (2) that he had asked UD-1 to monitor Chris Jensen at that time.

75

agreement need not be express, formal, or definite; evidence establishing a 'tacit understanding' among the conspirators to further a common purpose is sufficient.").

The circuit court also found that neither UD-1's participation in the parent support group meeting in 2013, nor his contradictory statements between when he was interviewed by the plaintiffs' counsel in April of 2013 and deposed in December of 2013, could have been in furtherance of a conspiracy of silence or harmed the plaintiffs because Michael had already been convicted for sexually abusing the Doe-1 children and the plaintiffs had already hired counsel to pursue this action. We view this evidence quite differently because a purpose of the alleged conspiracy was not just to protect Michael, but also to also cover up the Church's alleged role in facilitating Michael's abuse.

Certain statements made by UD-1when he was interviewed by the plaintiffs' counsel are clearly adverse to the defense in this matter in terms of what the defendants knew and when. When UD-1 was subsequently deposed, after meeting with the Church's lawyers for twelve to thirteen hours, he contradicted his earlier statements given in the interview. He explains this altered tack by criticizing the "imprecise, vague, and leading questions" asked previously by the plaintiffs' counsel.[84] A jury could reasonably infer, however, that UD-1 changed "his story" in furtherance of a purpose of the conspiracy–to

---

[84]*See supra* note 17.

conceal the Church's involvement–regardless of whether another purpose of the conspiracy–to protect Michael–could no longer be served. As John Doe-5 testified during his deposition, UD-1 "always told [him] that he would not do anything to hurt the church."

Similar to the conspiracy claim against the other defendants, there are numerous material issues of fact and disagreement as to the inferences to be drawn from those disputed facts. It is clear, however, that the circuit court improperly made determinations reserved to a jury and wrongly assumed the veracity of statements made by defense witnesses as a precursor to its conclusion that "[t]here is no evidence that UD-1 knew about Michael Jensen's abuse of the minor Plaintiffs until after Michael Jensen was arrested. . . . There is also no evidence that UD-1's actions helped or assisted other Defendants in breaching a duty that harmed Plaintiffs."

If a jury were to resolve the disputed evidence, make credibility determinations, and draw reasonable inferences, all in the plaintiffs' favor, it could find that UD-1 was part of a conspiracy and that his conduct furthered or promoted unlawful purposes designed to protect the Jensens and conceal the Church's involvement, which resulted in intentional torts and the plaintiffs' alleged harm. Accordingly, and for these reasons, we find the circuit court erred in granting UD-1's motion for summary judgment. The circuit court also dismissed the plaintiffs' request for punitive damages against UD-1 in light of its summary judgment

77

ruling.  Because we reverse the award of summary judgment in favor of UD-1, we also reverse the circuit court's ruling on punitive damages.

## IV.  Conclusion

Based on the foregoing, we reverse the circuit court's December 4, 2015, order granting summary judgment in favor of UD-1 and dismissing the plaintiffs' request for an award of punitive damages against him.  We also reverse the particular in limine rulings in the circuit court's December 30, 2015, order that have been addressed herein.  Finally, we reverse the circuit court's December 31, 2015, order granting summary judgment in favor of the Church defendants and Chris and Sandralee Jensen on the plaintiffs' conspiracy claim.  This action is remanded for further proceedings consistent with this opinion.

Reversed and Remanded.